# United States Court of Appeals
## For the First Circuit

---

No. 13-1950

UNITED STATES OF AMERICA,

Appellee,

v.

BEATRICE MUNYENYEZI,

Defendant, Appellant.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Steven J. McAuliffe, U.S. District Judge]

---

Before

Lynch, Chief Judge,
Thompson and Barron, Circuit Judges.

---

Mark E. Howard, with whom David W. Ruoff and Howard & Ruoff, PLLC, were on brief, for appellant.
Mark T. Quinlivan, Special Assistant United States Attorney, with whom Donald Feith, Acting United States Attorney, District of New Hampshire, and Carmen M. Ortiz, United States Attorney, District of Massachusetts, were on brief, for appellee.

---

March 25, 2015

---

**THOMPSON, Circuit Judge.**

**Overview**[1]

Man's inhumanity to man is limitless.  Any doubt, just recall the 1994 genocide in Rwanda.  Over the course of 100 days, roving bands of Hutus (Rwanda's majority ethnic group) slaughtered hundreds of thousands of their countrymen, most of them Tutsis (a minority group long-dominant in Rwanda).  Some of the crazed killers belonged to the Interahamwe, the dreaded militia of a Hutu political party known by the initials, MRND.[2] About 7,000 Rwandans died each day, often butchered by machete-wielding Interahamwes at roadblocks set up to catch fleeing Tutsis.  And these killers didn't just kill — they raped, tortured, and disfigured too.

Now meet Beatrice Munyenyezi, a Hutu from Rwanda.  She spent the genocide months (pregnant with twin girls) living at the Hotel Ihuriro in Butare, Rwanda — a hotel managed by her husband, Shalom Ntahobali, and owned by her mother-in-law, Pauline Nyiramasuhuko.  Ntahobali and Nyiramasuhuko were no ordinary hoteliers, however.  He was an Interahamwe leader who manned a notorious roadblock in front of the hotel.  She was a high-powered minister in Rwanda's MRND government who kicked-off the killing

---

[1] We present the facts below in the light most favorable to the government, because (as you will see) our defendant challenges the sufficiency of the evidence against her.  See, e.g., United States v. Polanco, 634 F.3d 39, 45 (1st Cir. 2011).

[2] MRND stands for the National Republican Movement for Democracy and Development.

frenzy there by telling the party's devotees that all Tutsi "cockroaches" must die. And Hutu thugs ultimately massacred more than 100,000 Tutsis in and around Butare.

Munyenyezi fled to Kenya in the genocide's waning days. Hoping to come to the United States as a refugee, she filled out immigration form I-590 in 1995, writing "none" when asked to list "political, professional or social organizations" that she had been a member of or affiliated with since her "16th birthday."[3] She also affirmed there that she had neither committed a crime of moral turpitude nor persecuted people on grounds of race, religion, or politics. Asked on another form whether she was personally affected by the "atrocities" in Rwanda — "Were you a victim? A witness? Were you otherwise involved?" — she simply wrote "family members disappeared." And she answered "no" to the question whether she either had a hand in killing or injuring persons during the genocide or had encouraged others to do so. The government approved her papers in 1996, and she moved to the United States in 1998.

About a year later Munyenyezi applied to change her status to lawful permanent resident. One question on her application asked her to jot down her "present and past membership in or affiliation with every political organization, association, . . . party, club, society or similar group" since turning 16. She

_____

[3] She turned 16 in 1986.

wrote "none."  She also checked "no" in answer to the questions whether she had ever committed a crime of moral turpitude and whether she had anything to do with genocide or with killing or injuring persons because of their race, ethnicity, religion, or politics.  The government approved her application in 2001.

In 2003 Munyenyezi applied for naturalization as an American citizen, declaring that the answers in her form N-400 — a naturalization form — were truthful.  Answers on that form included that she had (a) never been associated with any organization, party, club, or the like; (b) never done a crime leading to her arrest or conviction; and (c) never lied to or misled federal officials to get immigration benefits.  She became a naturalized citizen later that year.

In 2006 Munyenyezi testified at an international criminal court — commonly called the ICTR — as a witness for her husband (he was being prosecuted for his role in the Rwandan genocide).[4]  There she said that she saw no roadblock near her family's hotel or dead bodies in Butare, and she also said that her husband was no génocidaire.  Just a few short months after she testified, the federal government pulled her immigration file to check for any illegalities.

---

[4] ICTR is short for the International Criminal Tribunal for Rwanda.

Convinced that she had concealed her role in the Rwandan genocide — her part in the killings and rapes at the roadblock next to the Hotel Ihuriro, and her ties to the MRND and the Interahamwe — federal prosecutors later indicted Munyenyezi in 2010 on two counts of procuring citizenship illegally by making false statements to the government. See 18 U.S.C. §§ 1425(a) and (b). Her first trial ended in a hung jury. A second trial resulted in convictions. Using the 2002 edition of the federal sentencing guidelines, the judge then sentenced her to two concurrent 120-month prison terms.

On appeal Munyenyezi challenges the sufficiency of the proof against her, contests an evidentiary ruling, alleges prosecutorial misconduct, and questions the reasonableness of her sentence. We address each issue in turn, presenting only those facts needed to put matters into perspective. And at the end of it all, we find no reason to reverse.

## Sufficiency of the Evidence

As promised, we lead off with Munyenyezi's claim that the evidence is insufficient for a sensible jury to believe beyond a reasonable doubt that she infracted sections 1425(a) and (b). Hers is an uphill fight, however. See, e.g., Polanco, 634 F.3d at 45. Reviewing the record de novo — because (as the government concedes) she preserved the argument below — and taking the evidence and reasonable inferences in the light most helpful to the prosecution,

we see whether she has shown (as she must) that no rational jury could have convicted her.  See id.  And so doing, we take special care to remember our long list of "cannots":  we cannot reweigh the evidence, secondguess the jury on credibility issues (actually, we must assume it resolved credibility disputes consistent with the verdict), or consider the relative merits of her theories of innocence (because what matters is not whether a jury reasonably could have acquitted but whether it could have found guilt beyond a reasonable doubt).  See id.; see also United States v. Acosta-Colón, 741 F.3d 179, 191 (1st Cir. 2013).

Section 1425(a) makes it a crime for a person to "knowingly procure[] or attempt[] to procure . . . citizenship" illegally.  One way to do that is to make false statements in a naturalization application.  See 18 U.S.C. § 1001(a).  And — according to our judicial superiors — there are "four independent requirements" for a section 1425(a) crime:  "the naturalized citizen must have misrepresented or concealed some fact, the misrepresentation or concealment must have been willful, the fact must have been material, and the naturalized citizen must have procured citizenship as a result of the misrepresentation or concealment."  Kungys v. United States, 485 U.S. 759, 767 (1988); see also United States v. Mensah, 737 F.3d 789, 808-09 (1st Cir. 2013) (discussing Kungys in exquisite detail).  Section 1425(a)'s next-door neighbor, section 1425(b), makes it a crime for a person

-6-

to "knowingly . . . procure . . . naturalization . . . or citizenship" that she is not entitled to. One must have good moral character to be eligible for citizenship, of course. See 8 U.S.C. § 1427(a). And two of the many things that negate good character are (unsurprisingly) helping commit genocide, see 8 U.S.C. § 1101(f)(9), and making materially false statements to score immigration or naturalization benefits, see id. § 1101(f)(6).

Viewed from a prosecution-friendly perspective, the record in Munyenyezi's case is a bone-chilling read. Consider the following examples, taken from the testimony of government witnesses:

Richard Kamanzi told the jury that in March 1994 (about a month before the genocide, when he was 15 years old) he saw Munyenyezi (he had seen her before) decked out in MRND clothing, hanging out with 45 other MRNDers near the Hotel Ihuriro. He did not see her during the genocide, though.

But Vestine Nyiraminani did. She testified that in April 1994 she and her sister got stopped at the roadblock near the Hotel Ihuriro. An "Interahamwe named Beatrice" — a person Nyiraminani knew was married to Shalom Ntahobali — asked for IDs.[5] Seeing that their cards identified them as Tutsis, Munyenyezi ordered them to sit at the side of the road with other Tutsis. A half hour later,

---

[5] Remember that Munyenyezi's first name is Beatrice and her husband is Shalom Ntahobali.

-7-

soldiers marched them into the woods.  One of the thugs then plunged a knife into Nyiraminani's sister's head.  Nyiraminani escaped.  But she never saw her sister again.

Jean Paul Rutaganda testified about a time in April 1994 when (as a 15 year old) he and some other Tutsis hid at an Episcopal school near the Hotel Ihuriro.  Rutaganda spotted Munyenyezi (he knew her by name) at the roadblock with Interahamwes, wearing an MRND uniform, asking for identity cards, and writing in a notebook.  "She was counting," Rutaganda said, "registering dead Tutsis and others who were not yet dead." Tutsis, he added, "were killed day and night" in the nearby forest — something he knew from the "screaming" and the "crying."

Tutsi Consolee Mukeshimana also saw Munyenyezi around this time.  Mukeshimana had seen her before (at Mukeshimana's sister's house).  And at the roadblock Mukeshimana watched a fatigues-wearing Munyenyezi check IDs and lead Tutsis to other "Interahamwe so they could get killed."

Desperate to leave Butare because of the killing, Tutsi Vincent Sibomana tried to run but got detained at the roadblock. Munyenyezi asked for an ID.  He knew who she was because he had seen her buy beer at a store where he had worked.  And he had also seen an MRND-shirt-wearing Munyenyezi walking around Butare. Anyhow, Sibomana was too young to have an ID card, apparently (he was only 14).  An irate Interahamwe hit his head with a rifle butt.

And he fell into a ditch. More Tutsis were there. "Beatrice" — to quote Sibomana's testimony — then told the other Interahamwes to "kill[]" them all. Sibomana bolted. But he saw and heard Tutsis "being killed," hacked by "machetes" and bludgeoned with "clubs."

From this evidence a rational jury could conclude that Munyenyezi lied on her form N-400 — using "no" answers to hide her Interahamwe membership, her role in persecuting Tutsis, and her penchant for peddling untruths to get into America. She sees two ways around this. Neither way works.

One is her theory that the witnesses had zero credibility.[6] They just made stuff up, she says, thinking they would be hailed as "heros" in Rwanda for putting a Hutu behind bars. Some witnesses were only in their teens when the killing started, she stresses — the apparent intended inference being that they were too young to remember important details about what had happened. And culturally, she writes, the witnesses are inclined to saying whatever authority figures — like "jurors" — want to hear. Plus, she adds, in pushing their "stock" storyline, none of them identified her in court and some of them did not know details like whether she had children or what part of Rwanda she came from. Her theory fails, though, and for a simple reason. Munyenyezi's

---

[6] She, tellingly, does not claim that their testimony — if believed — is inadequate to help convict. And, just as importantly, she does not argue that the government failed to prove other elements of the crimes charged, like that the statements were knowingly made and material.

lawyer hit the credibility theme hard below — during his powerful opening statement, his spirited cross-examination of witnesses, his energetic evidence presentation (involving testimony from a counter-expert about pressures Rwandans feel to testify a certain way), and his hard-charging summation. But the jury did not buy it. And (again) credibility choices and evidence-weighing are for juries, not for reviewing courts. See Polanco, 634 F.3d at 45; see generally United States v. Nascimento, 491 F.3d 25, 46 (1st Cir. 2007) (stressing that "[s]ifting through conflicting testimony and determining where the truth lies is the sort of work that falls squarely within the jury's province").

Munyenyezi's other way is her claim that the evidence showed only her "mere presence" at the roadblock, which, she reminds us, is not enough to convict. But reading the record as required — afresh, and in the light most agreeable to the government — we think a levelheaded jury could find that she wasn't simply in the wrong place at the wrong time. Far from it — dressed as an Interahamwe, she personally inspected IDs at the checkpoint, separated those who would live from those who would die (and die gruesomely), and kept records of the ghastly going-ons. And that sinks her "mere presence" claim. See generally United States v. Echeverri, 982 F.2d 675, 678 (1st Cir. 1993) (noting that a "'mere presence' argument will fail in situations where the 'mere' is lacking").

Enough said about the sufficiency issue.

## Evidentiary Ruling

During opening statements defense counsel claimed that Munyenyezi "couldn't read or write English" when she came to America. And then he said — most importantly for our purposes — that "we'll have to speculate who was translating [the immigration] documents for her in Kenya when they were filling out those forms all in English."

Days later the prosecutor told the judge that he wanted to admit excerpts of Munyenyezi's testimony before the ICTR — appearing there on her husband's behalf, she denied seeing a roadblock near the Hotel Ihuriro or dead bodies in Butare, and she disclaimed knowing her husband was a génocidaire. The defense responded with a motion in limine, arguing that the ICTR evidence should be kept out as other bad acts to prove character (her propensity to lie about genocide), and even if not, that the danger of unfair prejudice substantially outweighed its probative worth. See Fed. R. Evid. 404(b) and 403; see also United States v. Landrau-López, 444 F.3d 19, 23 (1st Cir. 2006). The government disagreed, naturally, suggesting that the excerpts showed that she consistently presented a set of false facts concerning what had happened in Rwanda.

Refereeing this dispute, the judge sided with the government, ruling the ICTR evidence relevant because it countered

the suggestion that someone had translated the key immigration/naturalization papers for her and had "misconstrued what she said and put it down on the form[s]." "She's consistently said the same things," in the pertinent forms and at the ICTR, the judge added. So, he concluded, the ICTR evidence goes to "her knowledge," as well as "lack of accident, mistake" — legitimate nonpropensity purposes, one and all. And the excerpts ultimately came in through the testimony of Dr. Timothy Longman, the government's Rwanda-genocide expert.

Munyenyezi still thinks the judge got the ICTR-excerpts ruling all wrong. Reviewing the matter for abuse of discretion, see United States v. Doe, 741 F.3d 217, 229 (1st Cir. 2013), we think otherwise.[7]

Rule 404(b) bans other-acts evidence offered to prove a person's character. See Fed. R. Evid. 404(b)(1). But it allows such evidence for noncharacter purposes, like proving knowledge or lack of mistake or accident, see Fed. R. Evid. 404(b)(2) — provided of course the evidence's probativeness is not substantially outbalanced by any unfair prejudice, see Fed. R. Evid. 403. The problem for Munyenyezi is that her lawyer's opening remarks — that she could not read or write English when she lived in Kenya, so one

_____

[7] Neither side questions whether the judge's in limine decision was definitive enough to preserve the issue without need for further objection, see Rodríquez v. Señor Frog's de la Isla, Inc., 642 F.3d 28, 35 (1st Cir. 2011), so we let it pass.

-12-

must "speculate" about who translated and filled out the immigration papers — put knowledge or absence of mistake or accident in play. And the ICTR excerpts went to those noncharacter issues, helping to show that her answers did not result from some translation gaffe, because (as the judge said) the evidence suggests that she told essentially the same story about the Rwanda genocide at every turn. That the excerpts may have cast her in an unflattering light does not make them excludable under Rule 403 either. Only "unfair" prejudice that "substantially" outweighs the evidence's probative value is forbidden. See United States v. Rodríguez-Soler, 773 F.3d 289, 296 (1st Cir. 2014). And we see nothing unfair about letting the jury consider this evidence for the limited purpose of dealing with an issue that came to the fore in the defense's opening. We normally reverse a judge's Rule 403 ruling "only where [his] judgment is egregiously wrong." United States v. Adams, 375 F.3d 108, 111 (1st Cir. 2004). And nothing egregious screams off the pages of the record here.[8]

Munyenyezi's counter-arguments are not difference-makers. First she accuses the judge of not performing a Rule 404(b)

_____

[8] The government argues that the ICTR excerpts are intrinsic — not extrinsic — evidence and so not subject to Rule 404(b). See United States v. Souza, 749 F.3d 74, 84 (1st Cir. 2014) (discussing intrinsic and extrinsic evidence). But because we find no abuse of discretion even if the excerpts constitute extrinsic evidence, we need not grapple with this issue. See United States v. Jimenez, 507 F.3d 13, 18 (1st Cir. 2007) (taking that same tack).

analysis.  As already shown, the judge <u>did</u> do one in denying her in limine motion.  He just did not redo it when Dr. Longman took the stand, probably because she did not ask him to reconsider his earlier ruling.  Next she accuses the government of misleading the judge, an accusation that goes something like this:  the prosecutor said that he would not use the ICTR excerpts to paint her as a persistent liar but then did precisely that, like when he said during closing arguments that her ICTR testimony was part of a family "script."  She does not raise an issue of prosecutorial misconduct with the closing, however.  She just uses the comments to highlight why the judge abused his discretion by admitting the evidence in the first place.  We need not take a position on this point, though, because any error (if error there was) was harmless given the vast and damning array of evidence against her.  <u>See</u> <u>United States</u> v. <u>Dunbar</u>, 553 F.3d 48, 59-60 (1st Cir. 2009) (discussing the harmless-error standard when it comes to admitting evidence).

Two issues down, two to go.

### Prosecutorial Misconduct

Munyenyezi next claims the judge should have granted a mistrial based on the prosecutor's suggestive questioning.  Here is what you need to know.

Kicking off the trial, the judge cautioned the jury that a lawyer's "questions are not evidence.  So if a counsel asks a

question of a witness that assumes a fact, there's no evidence of that fact unless the witness accepts the fact." And the judge's antenna shot up — and he took corrective action — when either side's counsel asked questions that assumed facts not in evidence.[9]

Munyenyezi's claim centers on the prosecutor's cross-examination of defense witness Marie Alice Ahishakiye, a cook at the Hotel Ihuriro during the genocide. "Did you travel to Boston last year?" the prosecutor asked. "Yes," Ahishakiye replied. "And," the prosecutor said, "you were there for a proceeding involving Prudence Kantengwa; were you not?" Kantengwa is Munyenyezi's sister, by the way, and earlier the government introduced evidence showing Kantengwa faced "perjury" charges in Boston. "I don't think I know of Kantengwa," Ahishakiye answered.

---

[9] During the defense's cross-examination of Dr. Longman, for example, the judge sustained the government's objection to this line of questioning:
    Q. Are you aware that you are on the Friends of Evil list that is propagated by the state-run media out of Rwanda?
    A. I don't think I knew that, no.
    Q. And they are extremely critical of your views —
    [PROSECUTOR]: Objection.
    THE COURT: Sustained.
And then the judge said:
    You're not testifying . . . . Questions can be asked, but the questions are not themselves evidence. And facts assumed in the question [are] not evidence. So there's no evidence of such a thing. The witness hasn't heard of it.

The prosecutor then asked Ahishakiye about Kantengwa's husband, Athanase Munyemana.  Ahishakiye admitted that she had picked Munyemana out of a photo before.  "[Y]ou knew that he was the director of the secret police for the MRND government," the prosecutor said next, which drew a sustained objection from defense counsel.  And before breaking for lunch the judge reminded the jury that facts assumed in questions are not evidence.

Munyenyezi's lawyer moved for a mistrial, claiming prosecutorial misconduct.  The defense's theory was straightforward enough.  The prosecutor, the defense argued, botched the Ahishakiye cross by assuming two facts in his questions — that Ahishakiye had testified at Kantengwa's perjury trial (even though the prosecutor knew that she had not) and that Munyemana once headed the MRND secret police (even though the prosecutor had no basis for that claim).

On the first issue — concerning the question about testifying at Kantengwa's trial — the prosecutor fessed up to a mistake, saying he had a document showing Ahishakiye had come to America the year before and wrongly thought she had done so to testify for Kantengwa.  Calling the travel question "pretty dramatic," the judge said the prosecutor should correct the record for the jury.  And the prosecutor did just that, explaining in open court that he wrongly assumed in his question that Ahishakiye had gone to Boston to testify for Kantengwa — "in fact," he stressed,

she had actually traveled to New Hampshire to testify "in a prior proceeding involving" Munyenyezi. The judge jumped in, telling the jury that

> [w]hat the prosecutor has just clarified for you is that when he asked those questions one might think that there's an implication that she did do those things, and the prosecutor had a good faith basis for thinking that was so, but . . . the parties have learned that's not the case so they're clarifying that for you so you don't take that into account in determining the issues that are before you.

"Does that do it?" the judge asked. Both sides agreed that it did.

On the second issue — concerning the secret-police question — the prosecutor argued (and Munyenyezi does not contest) that he had a good-faith basis for touching on that topic, given that testimony at Kantengwa's trial suggested Rwanda had a secret-police agency. And, the prosecutor said, he believed that Ahishakiye would name Munyemana as its head (though the record is not exactly clear why he thought she would finger Munyemana as the head). "Are you suggesting he has no good faith basis to ask the question?" the judge asked defense counsel. "No," counsel said.

The judge later denied the mistrial motion. The prosecutor's "concession and my instruction to the jury," the judge said, effectively "cured any prejudice" that may have arisen because of the travel question. And, he added, the prosecutor had a good-faith basis for asking the secret-police question. The judge offered to give a curative instruction regarding the secret-

police question, which, he said, would tell the jury (again) that facts assumed in questions are not evidence. But the defense declined. "You know," the judge went on to say, "watching [the jurors'] reaction[s]" to what had happened, "if they understand one thing very, very well, they understand that questions of counsel are not evidence of the facts assumed in the questions." Still, the judge told the jury in his final charge that "[a]rguments, statements, and questions by lawyers are not evidence," and that "questions by lawyers are not evidence of any facts assumed in the questions."

Unshaken in her belief that the prosecutor's questioning required a mistrial, Munyenyezi blasts away at the judge's ruling. As she tells it, the prosecutor's actions — posing questions with "no evidentiary foundation" — rendered the trial fundamentally unfair by creating the misimpression that Ahishakiye was either lying or had a very bad memory. But what hurts her is the standard of review — we inspect the judge's ruling only for abuse of discretion, see Dunbar, 553 F.3d at 58, which means his decision stands unless no reasonable person could have ruled as he did, see United States v. Maldonado, 708 F.3d 38, 42 (1st Cir. 2013). The reason for this is that a district judge is much closer to the trial action than we can ever be and so is better positioned to see if prejudicial matter presented there could likely affect the case's outcome. See United States v. Pierro, 32 F.3d 611, 617 (1st

-18-

Cir. 1994). Granting a mistrial is strong medicine, of course — prescribed only as a last resort if the alleged harm cannot be overcome with less-drastic remedies, like curative instructions. See United States v. De Jesus Mateo, 373 F.3d 70, 73 (1st Cir. 2004).

With all this in mind, we think the judge handled the suggestive-questioning issue with sufficient sensitivity to Munyenyezi's fair-trial rights, taking timely action to minimize the risk of undue prejudice. He had the prosecutor face the jury, for example, and confess error on the subject of Ahishakiye's travels. And he followed that up with an instruction telling the jury not to take the prosecutor's questions on that point into account. The defense rejected the judge's offer of a curative instruction regarding the secret-police question. No matter, though. At every other turn (including during his final charge), the judge carefully instructed the jury that questions that assume facts are not evidence. We normally assume that juries follow instructions. See Acosta-Colón, 741 F.3d at 202 n.13. And we see no reason to stray from that practice here: remember, having watched the jurors closely, the judge said that he was "absolutely convinced" that they "completely" understood "that questions of counsel are not evidence of the facts assumed in the questions," and Munyenyezi gives us nothing to contradict his ring-side take on the case. Also hurting her is the fact that the abundance of

evidence against her "dwarf[s]" the complained-about prejudice arising from these few questions.[10]   See United States v. Butterworth, 511 F.3d 71, 76 (1st Cir. 2007).

The bottom line is this.  We reverse mistrial denials only under "extremely compelling circumstances."  Pierro, 32 F.3d at 617.  And the circumstances here do not come within a country mile of satisfying that standard.[11]

**Sentence Length**

That brings us to Munyenyezi's complaints about her 120-month sentence — the maximum term permitted by statute but well above the 0-6 month advisory guideline range (a range recommended by probation, which the judge adopted, without objection).  Simply put, she thinks the sentence is too long — that it is (in legalese)

---

[10] Munyenyezi says in a footnote that the prosecutor asked a rebuttal witness whether she knew Munyemana was an MRND "intelligence officer," suggesting that this question crossed the line too.  But she floats this idea only in passing, which means any argument lurking there is waived.  See, e.g., Nat'l Foreign Trade Council v. Natsios, 181 F.3d 38, 60 n.17 (1st Cir. 1999) (explaining "that arguments raised only in a footnote or in a perfunctory manner are waived").

[11] As a fallback, Munyenyezi also thinks that the prosecutor's conduct violated her Sixth Amendment right to confront witnesses who say they had "personal knowledge of a 'secret police' organization in Rwanda at the time of the genocide" or who say they had "personal knowledge" that Munyemana ran the secret police.  But because she cites no authority for this argument (nor does she offer any convincing explanation of what the law should be, assuming she found no authority), she has waived it.  See, e.g., Medina-Rivera v. MVM, Inc., 713 F.3d 132, 140-41 (1st Cir. 2013); Town of Norwood v. Fed. Energy Regulatory Comm'n, 202 F.3d 392, 405 (1st Cir. 2000).

substantively unreasonable.  Such an argument is usually a tough sell.  After all, there is no "perfect sentence," but, instead, "a wide universe of supportable sentencing outcomes."  <u>United States</u> v. <u>Del Valle-Rodríguez</u>, 761 F.3d 171, 177 (1st Cir. 2014).  We look only for abuse of discretion.  <u>See</u>, <u>e.g.</u>, <u>United States</u> v. <u>Medina-Villegas</u>, 700 F.3d 580, 583 (1st Cir. 2012).  And as long as we see "a plausible sentencing rationale" that reaches "a defensible result," the sentence stands.  <u>United States</u> v. <u>Martin</u>, 520 F.3d 87, 96 (1st Cir. 2008).  So it is here, as we now explain.

Munyenyezi first faults the judge for departing upward from that range under section 5K2.8 of the federal sentencing guidelines.  That section lets a judge depart upward if he finds "the defendant's conduct was unusually heinous, cruel, brutal, or degrading to the victim."  <u>See</u> USSG § 5K2.8 (2002 edition).  But in fact the judge <u>denied</u> the prosecutor's request for a section-5K2.8 departure.  Which pours cold water on this argument.[12]

The judge did rule that the case called for either an upward departure under section 5K2.0 or, alternatively, an upward variance under 18 U.S.C. § 3553(a).  Section 5K2.0 lets a judge depart upward if he finds aggravating circumstances of a kind or degree not adequately taken into account by the guidelines.  <u>See</u>

---

[12] The judge could not have been any clearer.  "I think 5K2.8 is not a legitimate legal basis to grant a departure," the judge said to the prosecutor, "[s]o, to the extent your motion is based on 5K2.8, that's denied."

-21-

USSG § 5K2.0 (2002 edition).[13]  Section 3553(a) lets a judge vary upward based on factors listed there, like the defendant's background (including her criminal history), the circumstances of the offense, the seriousness of the offense, the need to protect and deter others, the need to promote respect for the law and to provide a just punishment, and the need to eliminate unjustified sentencing disparities.[14]  And the judge made clear that she would receive the same sentence either way.

Munyenyezi attacks the judge's ruling on several fronts. None carries the day.

For starters, Munyenyezi criticizes the judge for not considering recently-amended guideline section 2L2.2 in his departure analysis — a section that specifically discusses sentencing enhancements for genocide-related acts.  See USSG § 2L2.2 (2012 edition).[15]  If the judge had applied section 2L2.2,

---

[13] A judge can depart downward in certain situations too.  See USSG § 5K2.0 (2002 edition) (discussing "mitigating circumstances").

[14] Under certain circumstances a judge can also vary downward using section 3553(a).

[15] Section 2L2.2 (2012 version) reads, in relevant part: Fraudulently Acquiring Documents Relating to Naturalization, Citizenship, or Legal Resident Status for Own Use; False Personation or Fraudulent Marriage by Alien to Evade Immigration Law; Fraudulently Acquiring or Improperly Using a United States Passport
(a)  Base Offense Level:  **8**
(b)  Specific Offense Characteristics
. . .
    (4)  (Apply the Greater):

she argues, her "genocidal conduct" would have been "taken into account," making her ineligible for a 5K2.0 enhancement — and her guideline range would have been 57-71 months, a range well below the 10-year statutory maximum. That is because a judge using section 2L2.2 can set the upper end of a defendant's sentencing range at the statutory maximum if the defendant committed a "serious human rights offense" and has a criminal history category of VI. Munyenyezi has a criminal history category of I, which as we just said would have yielded a guideline range of 57-71 months if section 2L2.2 held sway.

A couple of things pull the rug out from under Munyenyezi's theory, however. One, section 2L2.2 — the judge found and the parties agree — does _not_ apply here because of _ex post facto_ concerns. And two, the judge actually _did_ consider that section, checking solely to see if it offered any _guidance_ on the departure issue. He just found that it did not, concluding that regardless of her criminal history category, the "facts" that made her immigration/naturalization "statements lies" — _i.e._, the facts that showed her to be a génocidaire — are so "disturbing" that she

. . .

> (B) If the defendant committed any part of the instant offense to conceal the defendant's participation in (i) the offense of incitement to genocide, increase by **6** levels; or (ii) any other serious human rights offense, increase by **10** levels. If clause (ii) applies and the resulting offense level is less than **25**, increase to level **25**.

-23-

deserved the maximum sentence permitted by statute. Munyenyezi never pinpoints any error in the judge's conclusion, which means she has waived any argument she might have had. See, e.g., Rodríguez v. Municipality of San Juan, 659 F.3d 168, 175 (1st Cir. 2011).

Turning to section 3553(a), Munyenyezi protests that the judge punished her without knowing whether the jury found that she had lied about being a génocidaire or about being a member of a political party — he did not know, the argument goes, because the jury used a general-verdict form. But a judge can find facts for sentencing purposes by a preponderance of the evidence, so long as those facts do not affect either the statutory minimum, see Alleyne v. United States, 133 S. Ct. 2151, 2155 (2013), or the statutory maximum, see Apprendi v. New Jersey, 530 U.S. 466, 490 (2000) — exceptions not implicated here. And the judge did exactly that, finding a preponderance of proof that she had lied to hide her genocidal past.[16]

Which takes us to Munyenyezi's next section 3553(a) argument — that the judge sentenced her as a génocidaire even though he said he would not. Despite what she thinks, the judge

---

[16] She "personally participated in the mass killing" of innocents "merely because they were called Tutsi," the judge found — "mann[ing] the infamous roadblock in Butare" near the Hotel Ihuriro; checking IDs, keeping records, and "sort[ing] out who would die from those who would live"; and "direct[ing]" and "facilitat[ing] murder."

-24-

kept his word, explicitly hitting her with the statutory maximum not as "punishment for genocidal conduct" but because her lies were the "most serious" infractions "of section 1425 that one can describe."  She "is not accountable in this court" for her genocidal acts, the judge stressed.  But "she is accountable for lying to obtain refuge and citizenship for which she was not qualified."  And "lying about participation in genocide when specifically asked," the judge explained, knowing full well "that such conduct is automatically disqualifying with respect to immigration and citizenship seriously undermines the integrity of this country's immigration standards in the most offensive way" imaginable.  The judge drove home these points a little later in the hearing, saying that if he "were to impose a sentence" for her "participation in the Rwandan genocide," it

> would not be a sentence of ten years to be served concurrently on each count[;] it would be a sentence of, at minimum, obviously life in prison.  The sentence imposed here is far too lenient and entirely inadequate to sanction acts of genocide.  It is, however, within the range of punishments contemplated by Congress . . . and is adequate to sanction the most egregious violations of section 1425 that one can imagine.

And in exercising his judgment, the judge expressly tied the sentence to the relevant section 3553(a) factors, like protecting the community and deterring criminal wrongdoing, promoting respect for the law, and providing a just punishment.  "We cannot abide this country being a haven for génocidaires," the

-25-

judge emphasized. Citizenship applicants must know, he added, that if they "lie" about taking part in genocide, "the punishment for that fraud will not be lenient." By our lights, the judge's analysis is plausible and defensible.

As a last-ditch effort, Munyenyezi complains that her sentence is at "odds" with much-less severe sentences imposed by two other district judges in this circuit in two (supposedly) similar cases. And she suggests that the judge's failure to give her a sentence like the ones in the other two cases slighted section 3553(a)(6), which requires judges to consider "the need to avoid unwarranted sentence disparities." But that section primarily refers to <u>national</u> disparities among <u>similarly situated</u> defendants. <u>See</u> <u>United States</u> v. <u>Ayala-Vazquez</u>, 751 F.3d 1, 32 (1st Cir. 2014). Unfortunately for her, she never explains how her situation fits that bill. So any argument in this direction is waived. <u>See</u> <u>United States</u> v. <u>Zannino</u>, 895 F.2d 1, 17 (1st Cir. 1990).

## Final Words

Wrapping up, we <u>affirm</u> Munyenyezi's convictions and sentence.