# United States Court of Appeals
## For the First Circuit

No. 19-2041

BEATRICE MUNYENYEZI,

Petitioner, Appellant,

v.

UNITED STATES OF AMERICA,

Respondent, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Steven J. McAuliffe, U.S. District Judge]

Before

Thompson and Kayatta,
Circuit Judges.*

        Richard Guerriero, with whom Lothstein Guerriero, PLLC, was
on brief, for petitioner.
        Mark T. Quinlivan, Special Assistant United States Attorney,
with whom Scott W. Murray, United States Attorney, District of New
Hampshire, and Andrew E. Lelling, United States Attorney, District
of Massachusetts, were on brief, for respondent.

---

        * Judge Torruella heard oral argument in this matter and
participated in the semble, but he did not participate in the
issuance of the panel's opinion in this case.  The remaining two
panelists therefore issued the opinion pursuant to 28 U.S.C.
§ 46(d).

March 3, 2021

**KAYATTA, Circuit Judge.** Petitioner Beatrice Munyenyezi was convicted of procuring naturalization based on false statements to immigration officials about her conduct during the Rwandan genocide, see 18 U.S.C. § 1425(a), and of procuring naturalization as an ineligible person, see id. § 1425(b). Six years ago, we affirmed her conviction and sentence. United States v. Munyenyezi, 781 F.3d 532 (1st Cir. 2015). Two years later, in Maslenjak v. United States, 137 S. Ct. 1918 (2017), the Supreme Court described the role that a falsehood need play in acquiring citizenship to prove a violation of section 1425(a). Pointing to differences between that description and the instructions given to the jury in her case, Munyenyezi seeks vacatur of her conviction through a petition for habeas corpus relief under 28 U.S.C. § 2255(a). Because Munyenyezi was not actually prejudiced by the instructions as given, we affirm the district court's denial of Munyenyezi's petition. Our reasoning follows.

## I.

A detailed discussion of the background of this case, including Munyenyezi's trial, appears in our above-cited opinion affirming Munyenyezi's conviction and sentence on direct appeal. We summarize that background briefly to provide relevant context for our discussion in this post-conviction litigation.

This case arises out of the 1994 Rwandan genocide, during which members of Rwanda's majority ethnic group, the Hutus, killed

more than 700,000 Rwandans, mostly Tutsis, a minority ethnic group. The killing occurred at the behest of Rwanda's ruling party, the Hutu-dominated National Republican Movement for Democracy and Development ("MRND"). The MRND, led by President Juvénal Habyarimana, rose to power in 1973. President Habyarimana remained in office until his assassination on April 6, 1994, an event that brought Rwanda's long-running ethnic tensions to a head. MRND leaders seized on the president's death as an opportunity to demand violence against Tutsis. Members of the military, police, and the Interahamwe, the MRND's youth militia, responded by carrying out mass killings. Across Rwanda, local militias constructed roadblocks where they checked passing Rwandans' identification cards to determine their ethnicity. The militias detained Tutsis and then abused, tortured, and killed them. The campaign to eliminate Tutsis continued until July 1994.

On April 19, 1994, a speech by Rwanda's new president to officials of the southern Rwandan city of Butare prompted a systematic effort to hunt Tutsis in Butare using patrols and roadblocks. One of those deadly roadblocks was on Butare's main road in front of the Hotel Ihuriro.

The Hotel Ihuriro was home during the genocide for Petitioner Beatrice Munyenyezi, her husband, and their young child. Several facts about the occupants of the Hotel Ihuriro are uncontested: Munyenyezi's husband, Shalom Ntahobali, was the son

- 4 -

of the hotel's owners.  Shalom's mother, Pauline Nyiramasuhuko, was an MRND cabinet minister.  His father, Maurice Ntahobali, was a former politician and the head of the National University in Butare.  Shalom himself led Butare's Interahamwe militia, which supervised the roadblock in front of the Hotel Ihuriro, and he developed a reputation as a brutal murderer.

The dispute between the government and Munyenyezi centers on what Munyenyezi herself did during the genocide and whether she honestly described those actions to immigration officials.  Between 1995 and 2003, Munyenyezi successively and successfully sought status as a refugee, which required a special "Visa 6" security clearance; as a lawful permanent resident; and then as a naturalized citizen of the United States.  During this lengthy march to citizenship, she submitted to formal interviews and completed various application forms, including a questionnaire specifically tailored for applicants who had been in Rwanda since April 1, 1994 ("the Rwandan Questionnaire") and an application for naturalization known as Form N-400.

Several years after her naturalization, Munyenyezi drew the attention of United States officials when she testified on her husband's behalf at an international criminal court, claiming that there was no roadblock near her family's hotel and that her husband was not involved in the genocide.  Munyenyezi, 781 F.3d at 536.

After an investigation, the government concluded that Munyenyezi made the following five false statements on her Form N-400:

One, in response to a question on her Form N-400 that asks, ["]have you ever . . . been a member of or associated with any organization, association, fund, foundation, party, club, society, or similar group in the United States or in any other place,["] . . . [Munyenyezi] did not disclose her membership in and association with the MRND and Interahamwe, and she responded by putting an "X" in the box marked ["]no[."]

Two, in response to a question on her N-400 that asked, ["]have you ever persecuted, either directly or indirectly, any person because of race, religion, national origin, membership in a particular social group or political opinion,["] . . . [Munyenyezi] responded by putting an "X" in the box marked "no" and failed to disclose her direct and indirect persecution of Tutsis during the Rwandan genocide.

Three, in response to a question on her N-400 that asked, ["]have you ever committed a crime or offense for which you were not arrested,["] . . . [Munyenyezi] failed to disclose her participation in genocide, murder, rape, kidnapping, and theft, and responded by putting an "X" in the box marked "no." The government also alleges that [Munyenyezi] failed to disclose that she had previously violated United States criminal laws by providing false information in immigration interviews and documents, that is, the Form I-590, Form G-646, the Rwandan questionnaire, and Form I-485.

Four, in response to a question on her Form N-400 that asked, ["]have you ever given false or misleading information to any U.S. official while applying for any immigration benefit or to prevent deportation, exclusion, or removal,["] . . . [Munyenyezi] responded by

- 6 -

putting an "X" in the box marked "no" and failed to disclose false information she provided in previous [i]mmigration documents, that is, the Form I-590, Form G-646, the Rwandan questionnaire, and Form I-485.

Five, in response to a question on her N-400 that asked, ["]have you ever lied to any U.S. Government official to gain entry or admission into the United States,["] . . . [Munyenyezi] responded by putting an "X" in the box marked "no" and failed to disclose the false information she provided on the Form I-590, Form G-646, and the Rwandan questionnaire.

A federal grand jury indicted Munyenyezi. In count one, the government alleged that Munyenyezi violated section 1425(a) when she "knowingly procure[d] . . . her own naturalization contrary to law . . . by knowingly providing false and fraudulent information as to material facts in her . . . Form N-400." See 18 U.S.C. § 1425(a). In count two, the government alleged that Munyenyezi was "not entitled" to naturalization because -- among other reasons -- she gave materially false information during the immigration process and that she violated section 1425(b) by nevertheless "knowingly procur[ing] . . . [her] naturalization." See id. § 1425(b).

The first jury to consider the evidence deadlocked, necessitating a mistrial. Munyenyezi's retrial ended in her conviction on both counts.

Numerous Rwandan witnesses testified during the government's case-in-chief. At least four eyewitnesses testified

- 7 -

that they saw Munyenyezi decked out in the MRND's distinctively colored clothing, checking IDs and culling out Tutsis at the roadblock. Munyenyezi, 781 F.3d at 537. One of those eyewitnesses reported that Munyenyezi gave orders to have several Tutsis killed. Id.

Several immigration officials testified about how statements disclosing this activity would have affected Munyenyezi's various applications in her pursuit of eventual naturalization. That testimony established that naturalization would probably have been denied if she had admitted to participating in persecution, to committing a crime such as kidnapping for which she had not been arrested, or to helping the Interahamwe check identification cards at the roadblock. Government witnesses also explained how knowledge of MRND membership would have cast serious doubt on her receipt of a Visa 6 security clearance and would have at least led to much more inquiry that may well have resulted in a denial of her applications.

Following closing arguments, the trial judge instructed the jury that the "government must prove each of the following essential elements beyond a reasonable doubt" to establish a violation of section 1425(a): "First, that the defendant procured or attempted to procure United States citizenship. And second, that it was contrary to the law for the defendant to procure such citizenship. And third, that the defendant knowingly and

intentionally provided materially false statements on her Application for Naturalization, Form N-400."

The judge next explained that "[t]he government alleges that the defendant procured United States citizenship [']contrary to law['] because it claims she violated federal law which makes it unlawful to give false material statements in connection with procuring or attempting to procure immigration and naturalization benefits."

The judge then explained to the jury that to find that Munyenyezi violated section 1425(a), it had to "agree with regard to which specific false statement or statements the government has proved beyond a reasonable doubt" out of the five statements listed above. And to find that the government proved the falsity of statements four and five, the judge instructed that the jury had to "agree as to at least one prior material false statement." On appeal, both parties presume that the phrase "prior material false statement" refers only to a false statement about the conduct covered by statements one, two, or three.

The trial judge told the jury that a statement is "material" if

> it has a natural tendency to influence or to be capable of influencing the decision of the decisionmaker to which it was addressed. So, in this case, a statement is "material" if the statement had a natural tendency to influence, or was capable of influencing, the decision of a government agency in making a determination

required to be made. The government need not show that the agency was actually influenced by the statement involved. If a statement could have provoked governmental action, it is material regardless of whether the agency actually relied upon it.

After this court affirmed Munyenyezi's conviction and sentence, she filed a timely habeas petition pursuant to 28 U.S.C. § 2255(a) seeking relief on several grounds. Her petition was pending when the Supreme Court held in Maslenjak v. United States, 137 S. Ct. 1918 (2017), that the government must show "that an illegality played some role in [the] acquisition" of citizenship to prove a violation of section 1425(a). Id. at 1925. With the district court's permission, Munyenyezi added a claim to her section 2255 petition challenging the materiality instruction based on Maslenjak.

The district court rejected the claims raised in her initial section 2255 petition but did not address her Maslenjak claim. Munyenyezi obtained a certificate of appealability from this court as to the Maslenjak claim alone. After we remanded to allow the district court to address the claim in the first instance, the district court denied Munyenyezi's petition, reasoning that any error in the jury instructions was harmless beyond a reasonable doubt. Munyenyezi then filed this timely appeal.

To prevail on the claim for relief under 28 U.S.C. § 2255(a), Munyenyezi need show that her sentence "was imposed in violation of the Constitution or laws of the United States" or "is otherwise subject to collateral attack." 28 U.S.C. § 2255(a). Munyenyezi did not raise at trial the argument now advanced in her post-conviction request for relief. So, to rule in her favor, we would need to find not only that there was error in her trial, but also that there was "cause" not to have objected to the error and that "'actual prejudice' result[ed] from the error[]." United States v. Frady, 456 U.S. 152, 167-68 (1982). As did the district court, we put to one side the "cause" requirement -- and the government's arguments on that issue and others -- to go right to the question of whether, assuming error, there was actual prejudice as a result of that error.

To ascertain prejudice, we first examine the precise nature of the error said to have caused actual prejudice. Munyenyezi directs our attention to the jury instruction concerning the required relationship between a lie and the grant of citizenship. Drawing on the notion of materiality, the trial judge told the jurors that, in order to support a conviction, a false statement must have "a natural tendency to influence, or [be] capable of influencing, the decision" of an immigration officer. The judge further explained that it is enough if the

- 11 -

statement "could have provoked governmental action"; it need not have "actually" done so.

Munyenyezi argues that that instruction was error because it did not comport with what the Supreme Court subsequently required in Maslenjak to show that a defendant "knowingly procure[d] . . . , contrary to law, the naturalization of any person." 18 U.S.C. § 1425(a). In Maslenjak, the trial court instructed the jury that it could convict based on a finding that the defendant lied in procuring naturalization even if the lie was not "material" and "did not influence the decision to approve [her] naturalization." 137 S. Ct. at 1924 (alteration in original). After the Sixth Circuit affirmed the conviction, see United States v. Maslenjak, 821 F.3d 675 (6th Cir. 2016), the Supreme Court granted certiorari. It then vacated the Sixth Circuit's decision, finding the instruction dispensing with any materiality requirement improper. Maslenjak, 137 S. Ct. at 1924. In so finding, the Supreme Court established what at first blush may seem like a causation-in-fact requirement regarding the relationship between an illegal act and naturalization. The Court several times explained that an illegality must have "played some role in" the acquisition of naturalization, id. at 1923, 1925, 1927; that it "must have somehow contributed to the obtaining of citizenship," id. at 1925; and that "a jury must decide . . . whether a false statement sufficiently altered [the immigration]

- 12 -

processes as to have influenced an award of citizenship," id. at 1928.

When homing in on section 1425(a)'s application to lies to government officials, however, the Court made clear that the government need not prove that a lie did in fact cause, contribute to, or influence the award of citizenship. Rather, retreating from notions of causation-in-fact, the Court explained that jurors need not focus on the actual decisionmaker in the immigration proceeding at issue. Indeed, "the question of what any individual decisionmaker might have done with accurate information is beside the point." Id. Instead, "the proper causal inquiry under § 1425(a) is framed in objective terms: To decide whether a defendant acquired citizenship by means of a lie, a jury must evaluate how knowledge of the real facts would have affected a reasonable government official properly applying naturalization law." Id. And in making those decisions, the jury can consider whether a truthful response "would have prompted reasonable officials . . . to undertake further investigation" that "'would predictably have disclosed' some legal disqualification." Id. at 1929 (quoting Kungys v. United States, 485 U.S. 759, 774 (1988)).

The difference between what Maslenjak requires and the instruction given in this case is subtle but substantive. Reduced to its nub, Maslenjak requires proof that the truth would have predictably led a reasonable official to deny the application,

- 13 -

while the instruction here required that the government prove that the truth could have had such an effect.

We will assume that this difference means the given instruction was erroneous. As we have stated, we are also assuming without deciding that there was due "cause" not to have challenged the instruction at trial. So the pivotal question is whether the error resulted in "actual prejudice." Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (quoting United States v. Lane, 474 U.S. 438, 449 (1986)).

Courts have tinkered with the words used to describe exactly how one must ascertain "actual prejudice." Brecht pointed to the formulation set forth in the Supreme Court's earlier decision in Kotteakos: "whether the error 'had substantial and injurious effect or influence in determining the jury's verdict.'" Brecht, 507 U.S. at 637 (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)). Kotteakos itself also stated that an error can be overlooked as not causing actual prejudice if the reviewing court "is sure that the error did not influence the jury, or had but very slight effect." Kotteakos, 328 U.S. at 764. Our circuit in 1994 reasoned that under Brecht no actual prejudice is shown "if it is 'highly probable' that the challenged action did not affect the judgment." Singleton v. United States, 26 F.3d 233, 237 (1st Cir. 1994) (quoting United States v. Wood, 924 F.2d 388, 402 (1st Cir. 1991)) (applying Brecht to a section 2255 petition).

A year later, the Supreme Court spoke of not having "grave doubt" because one is convinced beyond "equipoise" that the error had not "substantially influenced the jury's decision." O'Neal v. McAninch, 513 U.S. 432, 435-36 (1995). And while we thereafter continued to apply the Singleton formulation, see, e.g., Sustache-Rivera v. United States, 221 F.3d 8, 18 (1st Cir. 2000),[1] the Supreme Court has more recently pointed us towards O'Neal's formulation of the pertinent inquiry, see Davis v. Ayala, 576 U.S. 257, 268, 276 (2015). That inquiry as formulated in O'Neal begins by asking, "Do I, the judge, think that the error substantially influenced the jury's decision?" 513 U.S. at 436. If the answer to that question is "yes," or if we are in "equipoise as to" the answer, then the error is not harmless. Id. at 435.[2]

With this inquiry in mind, we turn to Munyenyezi's argument that there is much reason to think that the "could have caused" (rather than "would have caused") instruction substantially influenced the jury's decision. Munyenyezi contends that we must consider this harmless error argument de novo in reviewing the district court's denial of her habeas challenge to

---

[1] The government asks us to do so again here.

[2] We reject Munyenyezi's argument that we should apply a "beyond a reasonable doubt" test for harmlessness, as we might were this a review of a preserved claim of error on direct review. See Chapman v. California, 386 U.S. 18, 24 (1967); see also United States v. Maslenjak, 943 F.3d 782, 787 (6th Cir. 2019).

- 15 -

her federal conviction, citing Pettiway v. Vose, 100 F.3d 198, 200 (1st Cir. 1996) ("Our review of a harmless error determination on habeas corpus review is de novo."). The government offers no objection or argument to the contrary, so we shall proceed with de novo review.

Munyenyezi begins her argument by pointing out that the jury's general verdict did not specify which of the challenged statements it found to be false. Building on this ambiguity, Munyenyezi constructs a two-part, "but-for" scenario that would warrant habeas relief. First, she describes the jury's verdict as likely resting on a finding that Munyenyezi's only false statement was her denial of MRND membership. In so arguing, she implicitly acknowledges that statements two[3] and three,[4] and part of one,[5] if false, would have obviously concealed information that would have led to the denial of her various applications during the naturalization process. And she presumes, as does the government,

_____

[3] In her second statement, Munyenyezi denied that she had "ever persecuted, either directly or indirectly, any person."

[4] In her third statement, Munyenyezi denied that she had "ever committed a crime or offense for which [she was] not arrested."

[5] By swearing that she had never "been a member of or associated with any organization, association, fund, foundation, party, club, society or similar group," Munyenyezi not only denied MRND membership but also Interahamwe membership in her first statement.

that statements four[6] and five[7] could only be found to be false based on a prior material false statement about activity addressed in statements one, two, or three. Second, she predicts that a differently instructed jury would have found that a lie limited to denying MRND membership would not have played a role in her successful pursuit of naturalization; i.e., learning of MRND membership would not have caused reasonable officials to deny her application or to undertake an investigation that predictably would have led to its denial. Because we find unconvincing her description of the likely basis for the guilty verdict, Munyenyezi's argument fails at the first step.

Munyenyezi's description of the likely basis of the jury's actual verdict cannot be squared with the trial record, which reflects that the contest of proof and argument trained overwhelmingly on two diametrically opposed, all-or-nothing versions of Munyenyezi's conduct in Rwanda. The government's witnesses testified that Munyenyezi was virtually all-in on the genocide: She joined the MRND, wore its clothing, joined the Interahamwe, and actually checked identity cards at the roadblock

---

[6] In her fourth statement, Munyenyezi denied that she had "ever given false or misleading information to any U.S. official while applying for any immigration benefit or to prevent deportation, exclusion, or removal."

[7] In her fifth statement, Munyenyezi denied that she had "ever lied to any U.S. Government official to gain entry or admission into the United States."

to find Tutsi victims to be separated out for murder. Munyenyezi's defense was an across-the-board denial and a claim that those witnesses were lying. She put on expert testimony suggesting that Rwandan witnesses tend to adhere to an "official narrative" promoted by their government. Munyenyezi also called several witnesses who spent time at the Hotel Ihuriro during the genocide. According to them, Munyenyezi was always in the hotel caring for her young child, and she wore loose-fitting maternity clothes, not military fatigues or MRND clothing, because she was pregnant with twins who were born on November 20, 1994 (more than seven months after the genocide began).

The closing arguments reflect the all-or-nothing nature of the case as presented to the jury. According to Munyenyezi's counsel, the Rwandan genocide was an event "in which she had absolutely no part." Moreover, Munyenyezi's counsel insisted that "[s]he wasn't a member of the MRND" and that the witnesses who said otherwise were "just wrong" and were "not telling the truth." The government, in turn, stressed that Munyenyezi lied about essentially everything to cover up her past. The all-or-nothing approach by both sides was virtually compelled by the nature of the evidence, which presented no readily apparent means for concluding that the government witnesses were lying about everything except MRND membership.

Munyenyezi nevertheless points to the government's statement in its closing argument that if "she told a single lie," she was guilty, and that "at a minimum she associated with the MRND." This was an invitation to the jurors, claims Munyenyezi, to find against her only on her denial of MRND membership and a recognition by the government that its proof was not as strong on the other issues. But in arguing that that lie was enough to convict, the government never suggested that there was any path in the record to find that that statement was false and the others true. And even if the government's strongest claim was that Munyenyezi lied about MRND membership, the fact remains that the evidence pointing to across-the-board lying was strong unless one labeled the government's witnesses as liars and Munyenyezi and her witnesses as honest.

The district court characterized the record at the second trial as "overwhelmingly establish[ing]" her participation in murder. And on her direct appeal we described the record as presenting a "vast and damning array of evidence against her." Munyenyezi, 781 F.3d at 540 (holding that any error in admitting into evidence Munyenyezi's international criminal court testimony was harmless). On such a record, it is quite a stretch to think that the jury found that she and her witnesses at trial lied only by falsely denying her MRND membership yet told the truth otherwise. The jury more likely viewed a lie about MRND membership

as the thirteenth stroke of Thomas Hardy's crazy clock:  "It was not only received with utter incredulity as regarded itself, but threw a doubt on all assurances that had preceded it."  Thomas Hardy, Far From the Madding Crowd 209-10 (First Vintage Classics ed. 2015).[8]  For these reasons, we reject as implausible the premise that Munyenyezi's conviction turned on a finding that she lied only about her MRND membership.  And with that premise rejected, and causation inexorable as to the other alleged lies, we find ourselves far past equipoise in answering "no" to the question of whether the assumed Maslenjak error in the instruction substantially influenced the jury's decision.  See O'Neal, 513 U.S. at 435-36.[9]

## III.

For the foregoing reasons, we affirm the denial of Munyenyezi's petition for a writ of habeas corpus.

---

[8]  With thanks to Dwight H. Sullivan & Eugene R. Fidell, Winding (Back) the Crazy Clock, 19 Green Bag 2d 397, 401 (2016).

[9]  Because we agree with the government that Munyenyezi has failed to show actual prejudice, we decline to address the government's alternative argument that the concurrent sentence doctrine bars habeas relief here.