# Matter of O-R-E-, Respondent

*Decided July 21, 2021*

U.S. Department of Justice
Executive Office for Immigration Review
Board of Immigration Appeals

(1) Immigration Judges and the Board lack the authority to recognize the equitable defense of laches in removal proceedings.

(2) The respondent's willful misrepresentations regarding his name, location of his residence, timing of his departure from Rwanda, and membership in political organizations on his Registration for Classification as Refugee (Form I-590) and supporting documents were "material" within the meaning of section 212(a)(6)(C)(i) of the Immigration and Nationality Act, 8 U.S.C. § 1182(a)(6)(C)(i) (2018), and he is therefore removable under section 237(a)(1)(A) of the Act, 8 U.S.C. § 1227(a)(1)(A) (2018).

(3) The evidence indicates that the respondent ordered, incited, assisted, or otherwise participated in the Rwandan genocide, and he did not produce sufficient countervailing evidence to demonstrate that he is not subject to the genocide bar at section 212(a)(3)(E)(ii) of the Act.

FOR RESPONDENT: Matthew Lytle Benson, Esquire, Cincinnati, Ohio

FOR THE DEPARTMENT OF HOMELAND SECURITY: Colleen A. Peppard, Assistant Chief Counsel

BEFORE: Board Panel: MALPHRUS, Deputy Chief Appellate Immigration Judge; CREPPY and PETTY, Appellate Immigration Judges.

PETTY, Appellate Immigration Judge:

The respondent is a native and citizen of Rwanda who was admitted to the United States as a refugee in 1996. Believing the respondent to have misrepresented certain personal details which obscured his role in the 1994 Rwandan genocide, the Department of Homeland Security ("DHS") initiated removal proceedings against him in 2019. An Immigration Judge found the respondent removable because he was inadmissible at the time of entry, concluded that the respondent failed to establish eligibility for any form of relief or protection from removal, and ordered him removed to Rwanda. Discerning no error, we will dismiss the respondent's appeal.

## I.  FACTUAL BACKGROUND

The respondent fled Rwanda in the midst of the 1994 genocide.  The civil war leading up to the genocide began in the early 1990s but was the culmination of decades of conflict.  While the origin of the ethnic classification is subject to some dispute, the population of Rwanda has in recent times been divided into three ethnic groups:  the Hutu, the Tutsi, and the Twa.  Sixty years ago, the Hutu majority overthrew the Belgian-supported Tutsi monarchy and established a republic in Rwanda.  Many Tutsis went into exile, including in Uganda, where the Rwandan Patriotic Front ("RPF") was established.  The paramilitary arm of the RPF invaded Rwanda in 1990.  Following a series of armed engagements, the 1993 Arusha Accords between the RPF and the Hutu-dominated National Republican Movement for Development (known by its French acronym, MRND), allowed the RPF to participate in Rwandan governance.  This arrangement was disfavored by MRND hardliners, who sought to deny the RPF any role in government.

Ultimately, the hardliners split from the moderate MRND members who had supported the Arusha Accords.  On April 6, 1994, a plane carrying the President of Rwanda and MRND leader Juvénal Habyarimana was shot down.  The MRND hardliners immediately took control of the Rwandan Government and set up roadblocks in Kigali for the purpose of identifying Tutsis.  The Rwandan Army—now under the control of the hardliners— fought the RPF, while a civil militia organized by the MRND, called the Interahamwe, committed genocide against the Tutsi civilian population.  The genocide continued until July 1994, when the RPF secured a military victory over the MRND.  By that time, between 750,000 and 1 million Rwandans had been killed, including three-quarters of Rwanda's Tutsi population.  *See generally Munyakazi v. Lynch*, 829 F.3d 291, 293 (4th Cir. 2016) (providing historical background on the Rwandan genocide).

The respondent was admitted to the United States as a refugee on June 18, 1996.  In his Registration for Classification as Refugee (Form I-590), the respondent swore that he fled Rwanda with his wife on or about April 12, 1994, because his wife, who is Tutsi, was threatened by the Interahamwe.  He claimed that his daughter, who was born on June 4, 1994, was born in Zaire.  The Form I-590 asked the respondent to list "[p]olitical, professional or social organizations of which I am now or have been a member or with which I am now or have been affiliated since my 16th birthday."  The form further instructed the respondent that if he was never "a member of any organization, state 'None.'"  On his form, the respondent wrote "None."  In the accompanying Biographic Information (Form G-325C), the respondent was asked to list all other names used.  He wrote "Roger."  In

December 1997, the respondent applied for adjustment of status under section 209(b) of the Immigration and Nationality Act, 8 U.S.C. § 1159(b) (1994).

At approximately the same time, several individuals in Rwanda wrote to the State Department implicating the respondent in the genocide. But it was not until much later that the Government investigation began in earnest. Two Government officials traveled to Rwanda in September 2009 and spoke with 16 individuals over the course of 6 days, completing reports of investigation shortly thereafter. All of the individuals interviewed knew the respondent by a surname different from the one listed on his Form I-590, and all but two were able to identify him in a photo array. The majority of those interviewed also stated that the respondent was known as "President" or "Councillor"[1] or was otherwise a leader of the local MRND or Interahamwe in the Gisozi sector of Kigali. One stated that he had known the respondent since childhood and that they were neighbors. This individual further stated that during the time he was a member of the Interahamwe, he took orders from the respondent consisting of lists of Tutsis to kill and was directed not to leave the bodies in the streets where they could be seen by cameras. Several noted that the respondent directed the murder of Tutsis at the St. Famille church, where ultimately over 150 people were killed. Investigators also spoke with the respondent's former spouse, who confirmed that the respondent was generally known by a surname different from the one listed in the Form I-590 and he was a member of the MRND. Another friend also confirmed the respondent was a member of the MRND.

While the respondent was present in the United States, a gacaca court[2] proceeding was held in absentia in Rwanda concerning the respondent's conduct during the genocide. The respondent was accused of being "Interahamwe's president as well as MRND president. He would give permission to kill and spare as well as being provided reports on the completed activities" and that "he was the one who would issue a list of those who were supposed to die." The court records reflect that it took testimony from numerous witnesses, and identified 12 individuals by name whom the respondent had a direct part in killing. The gacaca proceeding suggests that the respondent was a member of the MRND and affiliated with the Interahamwe militia during the genocide. In 2007, the gacaca court found

---

[1] In Rwandan usage, the term "Councillor" refers to the executive officer of a sector.

[2] "Because of the massive scale of the violence that occurred during the genocide, Rwandan communities were tasked with prosecuting large numbers of genocide perpetrators. Rwandan communities utilized a system of locally run courts, known as 'gacaca courts,' to oversee the prosecutions." *United States v. Ngombwa*, No. 14-CR-123-LRR, 2017 WL 508208, at *4 (N.D. Iowa Feb. 7, 2017), *aff'd*, 893 F.3d 546 (8th Cir. 2018).

the respondent guilty of "providing instructions on those who were supposed to die" and "supervising and controlling genocide," and sentenced him to 30 years' imprisonment. The Immigration Judge found, based on expert testimony, that because the respondent's conviction was in absentia, he would be entitled to a new trial should he return to Rwanda.

African Rights, a nongovernmental organization ("NGO"), issued a 30-page report detailing its own investigation into the respondent's conduct and concluded that he was the head of the MRND in the Gisozi sector, and that as head of the MRND he issued orders to Isaïe Ntirushwa, the head of the Interahamwe in Gisozi. African Rights claims to have interviewed over 20 eyewitnesses, including members of the Interahamwe who were armed by and took orders from the respondent. The report details the respondent's activities in organizing and arming the Interahamwe prior to April 6, 1994, and his activities on April 7, 1994, immediately following the assassination of President Habyarimana. Among other specific incidents, it reports that the respondent ordered the murder of Alfred Rutaysire, the leader of the Tutsis in Gisozi, as well as the torture of a man named Musonera. Later, the respondent ordered roadblocks to be put up, and instituted a "laissez-passer" permit system, which became "more important than the government's identity cards" in facilitating movement of Hutus through the roadblocks, while depriving others of freedom of movement.

On June 5, 2019, the DHS denied the respondent's application for adjustment of status and placed him in removal proceedings, charging him with being removable under section 237(a)(1)(A) of the Act, 8 U.S.C. § 1227(a)(1)(A) (2018), as an alien who was inadmissible at the time of entry under, among other provisions, section 212(a)(6)(C)(i) of the Act, 8 U.S.C. § 1182(a)(6)(C)(i) (2018), because of fraud or willful misrepresentation of material fact.[3] The DHS later amended the factual allegations and lodged an additional charge that he was inadmissible at the time of entry under section 212(a)(7)(A)(i)(I) of the Act, as an immigrant not in possession of valid entry documents. He applied for asylum under section 208(b)(1)(A) of the Act, 8 U.S.C. § 1158(b)(1)(A) (2018), withholding of removal under section 241(b)(3)(A) of the Act, 8 U.S.C. § 1231(b)(3)(A) (2018), and protection under the regulations implementing the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, *adopted and opened for signature* Dec. 10, 1984, G.A. Res. 39/46, 39 U.N. GAOR Supp. No. 51, at 197, U.N. Doc. A/RES/39/708 (1984) (entered into force June 26, 1987; for the United States Apr. 18, 1988) ("Convention Against Torture"). He also requested the Immigration Judge review the denial of his application

---

[3] The DHS also charged him with being inadmissible at the time of entry under section 212(a)(7)(B)(i)(II) of the Act, as a nonimmigrant who lacked valid entry documents, but this charge was later withdrawn.

for adjustment of status under section 209 of the Act, in conjunction with waivers of his inadmissibility under sections 209(a), (c), and section 237(a)(1)(H) of the Act.

The respondent conceded that he misrepresented information on his Form I-590 regarding both the location of his residence between April and July 1994 and his daughter's place of birth.  He testified that he was forced from his home in May or June, but he remained in Kigali until July 1994.  He testified that he was known as "Roger" for about 2 months while he was in school.  He conceded that he used a surname different from the one listed on the Form I-590 for official purposes in Rwanda, and that he was known professionally by this other surname.  He explained that he provided a middle initial on his immigration paperwork and claimed that no one asked him to spell out his middle name, which is the same as the surname he was known by in Rwanda.  When asked how his wife, who is Tutsi, was able to move through government roadblocks, the respondent was nonresponsive.

The respondent denied ever having been part of a political party in Rwanda, having attended an MRND meeting, or seeing any roadblocks in Kigali.  He denied participating in the genocide.  He testified that none of the material information provided to the Government investigators by the witnesses in Rwanda was true.  He claimed that the witnesses all provided false statements because of greed and hatred, to please the investigators, or to save their jobs.  Alternatively, the respondent surmised that statements may have been mistranslated or were invented by the interpreter.  He also disputed the ability of some witnesses to observe the events in question.  When asked where he stayed in Kigali after being forced from his home, the respondent was nonresponsive.  He conceded, however, that he included an incorrect date of displacement from Rwanda on his Form I-590 as a consequence of poor judgment.  He believed that his late date of departure would cause people to infer that he was involved in the genocide.  The respondent also admitted that he misled asylum officers about the location of his daughter's birth so that it would comport with his claimed (but admittedly false) date of departure from Rwanda.  When asked if he omitted the surname by which he was generally known in Rwanda from his refugee paperwork for the same reason, the respondent was nonresponsive.  Since arriving in the United States, the respondent has been active in Rwandan organizations and has been outspoken against the current government.

Four witnesses testified on behalf of the DHS.  In addition to the two Government investigators, the DHS presented testimony from Dr. Phil Clark, a professor of international politics at the University of London, as an expert witness on the history of the Rwandan genocide and systems of justice

responsive to the genocide.[4]  The DHS also presented testimony from Todd Gardner, Acting Branch Chief of the Refugee, Asylum and International Affairs Division at United States Citizenship and Immigration Services.  The respondent does not challenge the credibility of any of the DHS's witnesses and, in fact, relies on the testimony of Dr. Clark and Mr. Gardner in certain respects, but he takes issue with Dr. Clark's assessment of the fairness of the gacaca court system.

Two witnesses testified on behalf of the respondent.  The respondent's first witness testified that she was unaware of the respondent's political affiliations and never knew his surname, has never seen him hurt anyone, and believes someone else was the leader of the MRND in the Gisozi area.  The second witness testified that he came to the United States in 1990 and has not returned to Rwanda since.  For these reasons, he has no first-hand knowledge of the respondent's activities in Rwanda in 1994.

The Immigration Judge sustained the charge of removability, concluding that the DHS met its burden of proof by clear and convincing evidence.  The Immigration Judge found the respondent was not credible and that he had knowledge of and participated in the Rwandan genocide.  The Immigration Judge denied the respondent's applications for asylum, withholding of removal under the Act and Convention Against Torture based on this adverse credibility finding and because the respondent failed to demonstrate that he is not subject to the persecutor bar under sections 208(b)(2)(A)(i) and 241(b)(3)(B)(i) of the Act.  The Immigration Judge also determined that the respondent ordered, incited, assisted, or otherwise participated in genocide, torture, or extrajudicial killing under the color of law, rendering him inadmissible under sections 212(a)(3)(E)(ii) and (iii) of the Act, and thus ineligible for adjustment of status in conjunction with a waiver under sections 209(a), (c), or 237(a)(1)(H) of the Act.  Alternatively, the Immigration Judge denied the respondent's applications for asylum and withholding of removal on the merits.  Finally, the Immigration Judge denied the respondent's application for deferral of removal under the Convention Against Torture, after concluding the respondent failed to establish a likelihood that he would be tortured in Rwanda.

---

[4]  Dr. Clark opined that the NGO African Rights has become more closely aligned with the current Kagame regime in the last 5 to 10 years.  As a result, some of their recent publications reflect a greater political leaning, while earlier work was less biased and included some important documentation on the genocide and its aftermath.  The Immigration Judge credited Dr. Clark's testimony in full.

## II.  DISCUSSION

### A.  Timeliness

As a preliminary matter, the respondent argues that the DHS should have been precluded from instituting the removal proceedings against him because more than two decades have elapsed between the beginning of the Government's investigation and the commencement of removal proceedings. The respondent grounds this claim in the equitable doctrine of laches, which he incorrectly frames as a procedural due process right under the Fifth Amendment.  We reject this argument.[5]

We have generally held that we lack authority to recognize equitable defenses that would "preclude [the DHS] from undertaking a lawful course of action that it is empowered to pursue by statute and regulation."  *Matter of United Airlines Flight UA802*, 22 I&N Dec. 777, 783 (BIA 1999) (quoting *Matter of Hernandez-Puente*, 20 I&N Dec. 335, 338 (BIA 1991)). Furthermore, we have applied this general principle without regard to the form of proceeding before us.  *See Matter of United Airlines Flight UA802*, 22 I&N Dec. at 783 (carrier fine proceedings); *Matter of Hernandez-Puente*, 20 I&N Dec. at 338 (rescission proceedings); *see also Matter of Sparrow*, 20 I&N Dec. 920, 923–24 (BIA 1994) (rejecting laches defense in attorney discipline proceedings on the ground that laches "generally may not be invoked against the Government when it acts to enforce a public right or protect a public interest").

The doctrine of laches—a defense based on prejudicial delay in commencing a suit—was "developed by courts of equity."  *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 667, 678 (2014).  However, we are an "administrative body," not a court of equity.  *Matter of Cerda Reyes*, 26 I&N Dec. 528, 528 n.3 (BIA 2015); *see also Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 318 (1999) (noting that the Judiciary Act of 1789, which established Article III courts,

---

[5]  Although the respondent mentions the Confrontation Clause of the Sixth Amendment, he does not develop an argument in this respect.  Accordingly, we deem the issue waived. *See Matter of R-A-M-*, 25 I&N Dec. 657, 658 n.2 (BIA 2012).  The respondent also contends that the Immigration Judge erred in granting the DHS's March 18, 2020, emergency motion to reconsider without giving the respondent an opportunity to respond. The respondent does not, however, substantively challenge the position of the DHS that the Immigration Judge's initial decision omitted discussion of a necessary legal issue and incorrectly cited a statute.  Accordingly, we conclude this alleged error is, at most, harmless. *See Japarkulova v. Holder*, 615 F.3d 696, 701 (6th Cir. 2010) (stating that error is harmless where there is no "reason to believe that . . . remand might lead to a different result" (citation omitted)); *Matter of S-O-G- & F-D-B-*, 27 I&N Dec. 462, 467 n.2 (A.G. 2018) (noting that a scrivener's error not prejudicing the respondent is harmless).

"conferred on the federal courts jurisdiction over 'all suits . . . in equity'" (citation omitted)). Here, the DHS implemented its lawful authority under the Act to initiate removal proceedings. We have been granted no authority to preclude that lawful conduct. *See Matter of United Airlines Flight UA802*, 22 I&N Dec. at 783; *Matter of Hernandez-Puente*, 20 I&N Dec. at 338. Because delay is not "sufficient to estop the Government from enforcing the conditions imposed by Congress for residency in this country," *INS v. Miranda*, 459 U.S. 14, 18 (1982) (per curiam), we reject the respondent's laches defense.

Apart from laches, the respondent also contends that the delay in instituting proceedings violates his right to due process under the Fifth Amendment. Specifically, the respondent contends that the passage of time dulled the memories of the agents who prepared the investigative reports entered into evidence, which made cross-examination less useful than it might otherwise have been. He also complains that the reports of investigation contained hearsay within hearsay, suggests that the interviews "took place under extremely questionable circumstances," and claims that he has no way of confronting or cross-examining the witnesses whom the agents interviewed. Finally, the respondent suggests that the DHS failed to carry its burden of proof to show that he was removable by clear and convincing evidence because much of its investigation relied on evidence adduced at the respondent's in absentia gacaca court proceedings, or exhibits that the respondent contends "lack proper translation certificates" or contain illegible or incomplete documents.

To prevail on a due process claim, the respondent must demonstrate both that the proceedings lacked fundamental fairness and that he was prejudiced as a result. *See Montanez-Gonzalez v. Holder*, 780 F.3d 720, 723–24 (6th Cir. 2015). The admission of the DHS's documentary evidence did not render proceedings fundamentally unfair. To the extent that any documents would qualify as hearsay without falling into a hearsay exception—and we decline to undertake such an analysis—it is well settled that hearsay rules are not binding in immigration proceedings. *See Matter of D-R-* ("*D-R- I*"), 25 I&N Dec. 445, 461 (BIA 2011) ("Hearsay is admissible in immigration proceedings if it is reliable and probative."), *vacated on other grounds*, *Radojkovic v. Holder*, 599 F. App'x 646 (9th Cir. 2015); *see also N.L.A. v. Holder*, 744 F.3d 425, 436 (7th Cir. 2014). Immigration Judges have broad discretion to admit and consider relevant and probative evidence. *See Dallo v. INS*, 765 F.2d 581, 586 (6th Cir. 1985); *see also Matter of D-R- I*, 25 I&N Dec. at 458 ("In immigration proceedings the 'sole test for admission of evidence is whether the evidence is probative and its admission is fundamentally fair.'" (citation omitted)).

Given the "difficulties . . . inherent in trying to prove up facts related to events that occurred years past and thousands of miles away from where" a removal hearing is being conducted, "there will inevitably be gaps that can be bridged only by multiple levels of hearsay." *Angov v. Lynch*, 788 F.3d 893, 908 (9th Cir. 2015). The need for flexibility in evidentiary standards is at least as acute for respondents, as "[a]lmost every piece of evidence asylum petitioners present in support of their cases would be inadmissible if subjected to the rules of evidence, especially those pertaining to hearsay." *Id.* As the Ninth Circuit has observed, "[p]ersecutors are hardly likely to provide their victims with affidavits attesting to their acts of persecution." *Bolanos-Hernandez v. INS*, 767 F.2d 1277, 1285 (9th Cir. 1984).

Here, the Immigration Judge correctly determined that the DHS's evidence was reliable, relevant, probative, and its use was fundamentally fair, especially in light of the respondent's incredible testimony. *See Matter of D-R- I*, 25 I&N Dec. at 461.[6] That some of the evidence was derived from the respondent's in absentia gacaca court trial does not itself make the evidence unreliable. Contrary to the respondent's contentions, there is no prohibition on admission into evidence of the fact of an in absentia trial, a resulting conviction, or the records pertaining to that proceeding. *See Matter of Thomas*, 21 I&N Dec. 20, 24–25 (BIA 1995) (noting that an in absentia conviction "may at the very least constitute probable cause to believe [an individual] is guilty of the crimes in question" (citing *Esposito v. INS*, 936 F.2d 911, 914–15 (7th Cir. 1991)). The Immigration Judge accorded no legal effect to the conviction itself. Accordingly, we discern no due process violation.

Finally, we are not persuaded by the respondent's claim that the Immigration Judge was biased against him, as we have carefully examined the record and concluded that the Immigration Judge conducted a fair hearing, showing neither a preference for, nor a prejudice against, the position of either party. *See Matter of Fedorenko*, 19 I&N Dec. 57, 72–73 (BIA 1984), *abrogated on other grounds by Negusie v. Holder*, 555 U.S. 511 (2009). The respondent's claim that the Immigration Judge ignored evidence favorable to him is also unavailing. The record indicates that the Immigration Judge considered all evidence submitted by the parties, regardless of whether it was expressly mentioned in the decision.

---

[6]   The trier of fact may determine that the hearsay nature of testimony impacts its weight, but the hearsay nature does not preclude its admission. *Matter of D-R- I*, 25 I&N Dec. at 461. The Immigration Judge here found the evidence to be reliable and persuasive.

## B.  Removability

The respondent's removability under section 237(a)(1)(A) for being inadmissible at the time of entry turns on whether he made willful misrepresentations of material fact on his Form I-590 and supporting documentation.  For the following reasons, we conclude that the respondent willfully misrepresented his name, the timing of his departure from Rwanda, the location of his residence during the period he claimed to have fled, and his membership in the MRND.  We review the materiality of these misrepresentations de novo.  *See United States v. Stelmokas*, 100 F.3d 302, 317 (3d Cir. 1996); *see also Matter of D-R-* ("*D-R- II*"), 27 I&N Dec. 105, 108–09, 112–13 (BIA 2017) (applying the "natural tendency" definition of materiality in *Kungys v. United States*, 485 U.S. 759 (1988)—but not the "fair inference" test—in the inadmissibility context).[7]

On his Form I-590 the respondent used the first name he adopted upon his baptism, a middle initial, and his father's name.  In the section that asks for all other names used, the respondent provided the name "Roger" which, as he explained, was a nickname that someone had given him in school for approximately 2 months.  He did not list the surname he was generally known by in Rwanda, which he describes in his brief "as his name."  The respondent notes that he instead used his father's name on the Form I-590 because he is his father's eldest son.  The respondent later admitted that he failed to include the surname he was given at birth, known by, employed under, registered in school under, and which was generally used by others in Rwanda to refer to him on his refugee application.  We acknowledge that the respondent listed a middle initial that could stand for the surname he was known by in Rwanda, but the failure to fully list this other surname anywhere on a form that clearly requires all other names be listed was a misrepresentation.  The respondent knew that he was known by this other surname in Rwanda.  Listing "Roger"—a nickname the respondent used only briefly while he was a child—supports the Immigration Judge's finding that the respondent willfully withheld the surname he was generally known by in Rwanda because it demonstrates an understanding of the comprehensive nature of the question asked.

Identity is the factual cornerstone upon which eligibility for relief is built.  Misrepresenting one's identity is material to applications for relief and protection from removal because it impairs an adjudicator's ability to probe

---

[7]  Materiality is not a "but for" test.  *United States v. Latchin*, 554 F.3d 709, 713 (7th Cir. 2009) (noting Justice Stevens's position in *Kungys* favoring such an approach was shared by only two other Justices); *see also United States v. Ahmed*, 735 F. App'x 863, 869–70 (6th Cir. 2018).  Thus, the DHS need only establish that the misrepresentation was "capable of influencing" an adjudicator.  *Matter of D-R- II*, 27 I&N Dec. at 113.

past conduct that might be potentially disqualifying or bear on the exercise of discretion. It impairs the adjudicator's ability to inquire into potentially relevant past conduct because it blinds the adjudicator to whose past conduct is at issue. *See Matter of D-R- II*, 27 I&N Dec. at 113 (stating that a misrepresentation is "material" if it "tends to shut off a line of inquiry" relevant to admissibility and "would predictably have disclosed other facts" relevant to eligibility). Had the respondent disclosed the surname by which he was generally known in Rwanda, an adjudicator might have inquired whether he was the individual who was suspected (later, accused and convicted) of having had a leading role in the genocide in the vicinity of Gisozi. The respondent's failure to list the surname by which he had been known for virtually all purposes for his entire life was therefore material.

The respondent also wrote on the Form I-590 that he was displaced or fled from Rwanda on April 12, 1994. The respondent acknowledges that this was a misrepresentation. On an Application for Waiver of Grounds of Inadmissibility (Form I-601), the respondent wrote, "I acknowledge that I misrepresented information on my refugee application and my accompanying G-325A form submitted in 1996 regarding my daughter's place of birth and where I resided between April and July 1994." The respondent further testified that this misrepresentation resulted from a "lack of good judgment." He similarly stated that he had claimed his daughter was born in Zaire rather than Rwanda "because we want to match the . . . displacement."

A claim that the respondent departed Rwanda on April 12, 1994, would, if believed, remove him from consideration as a participant in any acts of genocide that occurred in Rwanda after that date. Between April 6, 1994, when the genocide began, and April 11, 1994, only about 20,000 Tutsis and moderate Hutus had been killed. Ultimately, between April 6, 1994, and the end of July 1994, between 750,000 and 1 million people were murdered. The date of the respondent's departure therefore "has a natural tendency" to influence an adjudicator because the date he provided suggested he was outside of the country and therefore not implicated in more than 97 percent of the killings. The supporting misrepresentation concerning the location of the respondent's daughter's birth is likewise material. Indeed, it not only had the natural tendency to influence an adjudicator, but according to the respondent, it was actually calculated to do so.

The Form I-590 also required the respondent to disclose all political, professional and social organizations with which he had been affiliated since his 16th birthday. The respondent wrote "None." The Immigration Judge found, based on the Government's investigation, the African Rights report, and the testimony adduced at the gacaca trial, that the respondent was a member of the MRND. This finding is not clearly erroneous, and the

respondent's failure to disclose his membership is therefore a misrepresentation.

This misrepresentation was material as well because it cut off a line of inquiry into the respondent's personal involvement in specific, known events that, if the respondent was personally involved, may result in disqualification from immigration benefits. *Matter of D-R- I*, 25 I&N Dec. at 450–51 ("The respondent's deliberate omission from his refugee application that he was a special police officer in the Republic of Srpska during the Bosnian War could have influenced the Government's decision whether to grant him refugee status."). Here, the MRND had control of the Interahamwe, which perpetrated the genocide. Thus, the respondent's failure to disclose his affiliation with the MRND cut off a line of inquiry with respect to his involvement in the genocide. *See Matter of D-R- II*, 27 I&N Dec. at 113. For these reasons, we affirm the Immigration Judge's conclusion that the respondent is removable as charged.

## C. Relief and Protection from Removal

The Immigration Judge's adverse credibility finding precludes the respondent from establishing his eligibility for asylum and withholding of removal. We further conclude that the evidence indicates that the respondent is subject to the genocide bar under the Act and that the respondent's evidence fails to establish that he is not subject to this mandatory bar. The respondent is therefore precluded from all forms of relief and protection from removal, with the exception of deferral of removal under the Convention Against Torture. We will also deny adjustment of status and all waivers in the exercise of discretion. Finally, the Immigration Judge correctly determined that the respondent failed to establish his eligibility for deferral of removal under the Convention Against Torture.

### 1. Adverse Credibility Finding

Truthful testimony is the cornerstone of the asylum process. We have explained that the immigration court system has "no more solemn duty" than to offer protection to those facing persecution or torture in their home countries. *Matter of O-M-O-*, 28 I&N Dec. 191, 197 (BIA 2021). False claims "can raise doubts about the validity of legitimate claims" and "undermine confidence" in the entire system. *Id.* at 198 (citing *Matter of Gomez-Beltran*, 26 I&N Dec. 765, 768 (BIA 2016)); *see also Singh v. Holder*, 643 F.3d 1178, 1182 (9th Cir. 2011); *Martinez v. Holder*, 557 F.3d 1059, 1065 (9th Cir. 2009).

We affirm the Immigration Judge's adverse credibility finding, because it is not clearly erroneous. *See* 8 C.F.R. § 1003.1(d)(3)(i); *Matter of J-Y-C-*, 24 I&N Dec. 260, 263 (BIA 2007); *see also El-Moussa v. Holder*, 569 F.3d 250, 255 (6th Cir. 2009) (stating that the courts owe deference to Immigration Judges "on the issue of credibility"). The Immigration Judge's finding is properly based on inconsistencies and omissions between the respondent's testimony and the documentary evidence, as well as the implausibility of his testimony. *See* section 241(b)(3)(C) of the Act (incorporating by reference section 208(b)(1)(B)(iii) of the Act); *see also* section 240(c)(4)(C) of the Act, 8 U.S.C. § 1229a(c)(4)(C) (2018); *El-Moussa*, 569 F.3d at 256; *Matter of J-Y-C-*, 24 I&N Dec. at 265.

As noted, the respondent listed his childhood nickname on the Form I-590 and failed to list the surname by which he was commonly known. The respondent did not provide a reasonable explanation for why he included his childhood nickname on his refugee application but omitted this surname. The respondent also testified that he was last in Rwanda in July 1994, but he stated on his Form I-590 that he left that country on April 12, 1994. The respondent later admitted that he wrote the wrong date because of a lack of good judgment and his belief that others would infer his involvement in the genocide based on his late date of departure from Rwanda. We are not persuaded by the respondent's assertion that the Immigration Judge did not consider the context of his testimony or relied upon facts that were immaterial.

Additionally, the Immigration Judge properly found the respondent's account of his and his family's personal circumstances at the time of the Rwandan genocide to be implausible. *See Wang v. Lynch*, 824 F.3d 587, 591 (6th Cir. 2016) (providing that the "inherent implausibility of elements of [an applicant's] story" justify an adverse credibility finding). The respondent was unable to articulate a clear account of what he and his family did during the genocide, where they lived, how his pregnant Tutsi wife made it safely through roadblocks, or why they remained in Rwanda for so long after the genocide began. Rather, the respondent denied almost every piece of information provided by the 16 witnesses interviewed by the Government and attempted to attack the credibility of several witnesses, with no evidence to support his claims. The Immigration Judge found it implausible that the witnesses interviewed by the Government, the witnesses who testified at the gacaca trial, and the individuals who wrote letters to the State Department in 1997 all independently provided false or incorrect testimony against the respondent. *See United States v. Munyenyezi*, 781 F.3d 532, 538 (1st Cir. 2015) (rejecting nearly identical arguments concerning witness perception and credibility).

The Immigration Judge also found implausible the respondent's contention that, although he was in Kigali for almost the entirety of the genocide, he never saw any roadblocks. *See Hachem v. Holder*, 656 F.3d 430, 434–35 (6th Cir. 2011) (affirming an adverse credibility finding where the Immigration Judge considered the brevity of the applicant's statements in his application and at the hearing, lack of detail about his experiences, demeanor, and implausible stories). The systematic and coordinated use of roadblocks to identify Tutsis during the genocide has been well documented and was confirmed by expert testimony before the Immigration Judge. *Accord Munyenyezi*, 781 F.3d at 535 ("About 7,000 Rwandans died each day, often butchered by machete-wielding Interahamwes at roadblocks set up to catch fleeing Tutsis.").

The Immigration Judge also found that the respondent "was evasive in his responses, frequently non-responsive to the questions asked, and repeatedly belligerent with the Court and the Department."[8] The respondent has not contested these findings. Instead, he raises two challenges to the Immigration Judge's adverse credibility finding. He contends that the evidence demonstrates that he and his witnesses were credible, and that the Immigration Judge failed to consider three exhibits purportedly documenting his political activities since arriving in the United States. Neither contention has merit.

The Immigration Judge found that the testimony of the respondent's two witnesses lacked credibility. In particular, the record contains a letter of support on behalf of the respondent from 2014 purportedly written by the first witness. When confronted with the letter, the first witness denied that she had written it, though she identified her signature at the bottom of the letter. She then testified that she may have just signed the letter without having written it. In addition, the first witness's testimony was inconsistent with her own refugee application regarding the number of days she stayed at a hotel after she left her home in Rwanda in April 1994. She did not provide sufficient explanations for the inconsistencies.

The Immigration Judge also properly found that the respondent's second witness was not credible. While this witness testified that he was a member of the MRND in Rwanda, his affiliation was not included in his Application for Naturalization (Form N-400). Furthermore, while the second witness

---

[8]  We are not well-placed to second-guess an Immigration Judge's findings based on a respondent's or a witness's demeanor. Volume, tone, cadence, lengthy pauses, facial expressions, body language, and other nonverbal indications that a witness has lost the thread of a fictitious claim or has been caught in a misrepresentation are often lost in the transcription of the record. *See, e.g.*, *Abdulahad v. Holder*, 581 F.3d 290, 295 (6th Cir. 2009). Accordingly, credibility findings based on demeanor are normally given a high degree of deference. *Matter of A-S-*, 21 I&N Dec. 1106, 1111 (BIA 1998).

testified that only he and his father were members of the MRND, the personal statement attached to his asylum application stated that numerous extended family members were MRND members, who were tortured and murdered. This witness did not provide reasonable explanations for these inconsistencies and material omissions.

An adverse credibility finding is a finding of fact, and our review is limited to clear error. On this standard, we decide only whether, in light of the evidence, the Immigration Judge's finding was permissible. *See Matter of J-Y-C-*, 24 I&N Dec. at 263; *see also U.S. Bank Nat'l Ass'n ex rel. CWCapital Asset Mgmt. LLC v. Village at Lakeridge, LLC*, 138 S. Ct. 960, 966 (2018) (describing the clear error standard for factual findings as "a serious thumb on the scale for the [factfinder]"). Because the Immigration Judge's adverse credibility finding is supported by the record, it is not clearly erroneous.[9]

Accordingly, we agree with the Immigration Judge that the respondent's and his two witnesses' lack of credibility prevents him from meeting his burden of proof for asylum and withholding of removal. *See* 8 C.F.R. §§ 1208.13(a), 1208.16(b) (2020); *Slyusar v. Holder*, 740 F.3d 1068, 1072 (6th Cir. 2014) ("An adverse credibility determination is fatal to claims for asylum and relief from removal, preventing such claims from being considered on their merits."); *Matter of M-S-*, 21 I&N Dec. 125, 129 (BIA 1995) (same). On appeal, the respondent points to no evidence that establishes his eligibility for asylum, on any basis, independent of his discredited testimony. We therefore affirm the denial of the respondent's applications for asylum and withholding of removal under the Act based on the Immigration Judge's adverse credibility finding.

## 2. The Genocide Bar

The respondent is also barred from all forms of relief and protection from removal, with the exception of deferral of removal, because he is subject to

---

[9]  The respondent also suggests that the Immigration Judge failed to consider letters of support attesting to the respondent's political activities since arriving in the United States. The Immigration Judge did fail to note this evidence in his conclusion, which states that the respondent "relied solely on incredible testimony from himself and [a witness] to support his political activities." However, the Immigration Judge's adverse credibility finding was premised on the respondent's demeanor and the implausibility of his claimed conduct in Rwanda. The respondent's activities in the United States were not material to the Immigration Judge's adverse credibility finding. We therefore conclude that any error in this regard is harmless. In any event, the portion of the Immigration Judge's decision cited by the respondent concerns his fear of persecution in Rwanda, not the adverse credibility finding. The portion addressing the adverse credibility finding cites two of the three exhibits the respondent contends were not considered.

the genocide bar under section 212(a)(3)(E)(ii) of the Act. "[W]hen an alien applies for relief from removal, the alien bears the burden to prove that he meets the eligibility requirements for the specific form of relief requested." *Matter of Thomas and Thompson*, 27 I&N Dec. 674, 690 (A.G. 2019) (citing section 240(c)(4) of the Act); *see also Pereida v. Wilkinson*, 141 S. Ct. 754, 760 (2021) ("The [Act] states that '[a]n alien applying for relief or protection from removal has the burden of proof to establish' that he 'satisfies the applicable eligibility requirements' and that he 'merits a favorable exercise of discretion.'" (second alteration in original) (quoting same)). "If the evidence *indicates* that one or more of the grounds for mandatory denial of the application for relief *may apply*, the alien shall have the burden of proving by a preponderance of the evidence that such grounds do not apply." *Matter of M-B-C-*, 27 I&N Dec. 31, 33 (BIA 2017) (quoting 8 C.F.R. § 1240.8(d) (2016)).

Section 212(a)(3)(E)(ii) of the Act renders inadmissible any alien who ordered, incited, assisted, or otherwise participated in genocide, as defined in 18 U.S.C. § 1091(a) (2018). Section 1091(a) defines the offense of "genocide" as follows:

> Basic Offense.—Whoever, whether in time of peace or in time of war and with the specific intent to destroy, in whole or in substantial part, a national, ethnic, racial, or religious group as such—
>   (1) kills members of that group;
>   (2) causes serious bodily injury to members of that group;
>   (3) causes the permanent impairment of the mental faculties of members of the group through drugs, torture, or similar techniques;
>   (4) subjects the group to conditions of life that are intended to cause the physical destruction of the group in whole or in part;
>   (5) imposes measures intended to prevent births within the group; or
>   (6) transfers by force children of the group to another group . . . .

There is no waiver for this ground of inadmissibility, and an alien who is inadmissible under this provision is barred from seeking, among other forms of relief and protection, adjustment of status, asylum, and withholding of removal under both the Act and the Convention Against Torture. *See* sections 209(a)(2), (c), 237(a)(1)(H) of the Act (barring applicants who are inadmissible under section 212(a)(3)(E)(ii) from waiving their inadmissibility and applying for adjustment of status); *Matter of D-R-I*, 25 I&N Dec. at 463 (providing that aliens who are removable under section 237(a)(4)(D) of the Act[10] are barred from seeking asylum and withholding

---

[10] Section 237(a)(4)(D) renders an alien deportable if he or she is described in, among other provisions, section 212(a)(3)(E)(ii) of the Act.

of removal under the Act and the Convention Against Torture); 8 C.F.R. §§ 1208.13(c)(1), 1208.16(d)(2).

Although the respondent challenges the weight the Immigration Judge accorded to certain evidence concerning his conduct in Rwanda, he does not dispute that what happened in the spring of 1994 in Rwanda qualifies as genocide. Thus, the question before us is whether the evidence indicates that the respondent ordered, incited, assisted, or otherwise participated in genocide as it is defined in 18 U.S.C. § 1091(a)[11] and, if so, whether the respondent has produced sufficient countervailing evidence to demonstrate that he did not do so. We conclude that the evidence indicates that the respondent ordered, incited, assisted, or otherwise participated in the killing of Tutsis with the specific intent to destroy the Tutsi people in whole or in substantial part, and that the respondent has not established otherwise. *See* section 212(a)(3)(E)(ii) of the Act; *see also* 18 U.S.C. § 1091(a)(1)–(4); *Matter of M-B-C-*, 27 I&N Dec. at 36–37.

The evidence indicates that the respondent ordered genocide. One individual interviewed by the Government investigators explained that he personally took orders from the respondent consisting of lists of Tutsis to kill. This is corroborated by the gacaca court records, which similarly indicate that others accused him of being "the one who would issue a list of those who were supposed to die" and that the respondent was found guilty of "providing instructions on those who were supposed to die" and "supervising and controlling genocide." Other witnesses stated that the respondent directed the murder of Tutsis at the St. Famille church and elsewhere. Five individuals wrote to the State Department accusing the respondent of directing and participating in the extermination of Tutsis as a leader of the Interahamwe in Gisozi sector. One wrote that the respondent "sent a mob of killers to our home, and they killed my mother and two younger sisters." Another said that he "instructed the militias to start killing and setting the houses ablaze." Additionally, there is evidence that the respondent ordered the creation of a network of roadblocks and a permit system to facilitate the identification and killing of Tutsis.

---

[11] The Intelligence Reform and Terrorism Prevention Act of 2004 ("IRTPA"), Pub. L. No. 108-458, § 5501(a)(1), 118 Stat. 3638, 3740, expanded the language of section 212(a)(3)(E)(ii) of the Act from "has engaged in conduct that is defined as genocide" to the broader phrase "ordered, incited, assisted, or otherwise participated in genocide." A Senate Judiciary Committee report notes that "[t]his broader scope will ensure that the genocide provision addresses a more appropriate range of levels of complicity." S. Rep. No. 108-209, at 6, 10 (2003). To assist or otherwise participate in genocide requires "(1) [a] nexus between the alien's role, acts, or inaction, and the [genocide]; and (2) his scienter, meaning his prior or contemporaneous knowledge of the [genocide]." *Matter of D-R- II*, 27 I&N Dec. at 120.

The evidence also indicates that the respondent incited genocide. One witness interviewed by the Government explained that because the respondent was the leader of the MRND, he led their meetings, and that after those meetings the MRND would sometimes kill Tutsis. The African Rights report indicates that immediately after the death of President Habyarimana, the respondent addressed a crowd assembled in front of Ntirushwa's home, and said, "I don't want to waste time explaining why we are here. There are enemies to go and find. You are all sufficiently well-equipped to be able to wipe out those who hope their brothers, the *inyenzi*, [12] will overrun the country."

The evidence additionally indicates that the respondent assisted or otherwise participated in genocide. As the Immigration Judge found, the record is replete with such evidence. The investigation reports contain witness statements that declare the respondent was a leader and member of the MRND. The African Rights report also describes in detail the respondent's participation in the MRND and his activities during the genocide. Additionally, the gacaca trial records indicate that the respondent was a member of the MRND and affiliated with the Interahamwe militia during the genocide. He was found guilty and sentenced to 30 years for genocide; complicity in genocide; conspiracy to commit genocide; murder; extermination; and formation, membership, leadership, and participation in an association of a criminal gang, whose purpose and existence was to do harm to people or their property.

Overall, we agree with the Immigration Judge that this documentary evidence indicates that the respondent ordered, incited, assisted, or otherwise participated in "genocide" within the meaning of 18 U.S.C. § 1091(a). *See Mukeshimana v. Holder*, 507 F. App'x 524, 527 (6th Cir. 2012) (per curiam) (concluding that evidence of an individual's in absentia conviction for crimes relating to the Rwandan genocide in a gacaca court and her sentence to 19 years' imprisonment "indicat[ed] that grounds existed for a mandatory denial" of asylum and related forms of protection); *Matter of M-B-C-*, 27 I&N Dec. at 36–37. Thus, it became incumbent upon the respondent to show by a preponderance of the evidence that the bar did not apply. *See* 8 C.F.R. §§ 1208.13(c)(1), 1208.16(d)(2), 1240.8(d); *Matter of M-B-C-*, 27 I&N Dec. at 33. The respondent's evidence—which in relevant part consisted principally of his and his witnesses' discredited testimony—is insufficient to establish that he did not order, incite, assist, or otherwise participate in "genocide" within the meaning of section 212(a)(3)(E)(ii) of the Act. Consequently, we affirm the Immigration Judge's determination that the

---

[12] Literally, "cockroaches," a reference to the RPF and Tutsis more broadly. *Munyenyezi*, 781 F.3d at 535.

respondent is subject to the genocide bar and ineligible for all forms of relief and protection from removal except deferral of removal under the Convention Against Torture.[13]  *See* 8 C.F.R. § 1208.17(a) (2020).

### 3.  Discretion

Although we need not reach the issue of discretion because the respondent is statutorily barred from adjustment of status under section 209 of the Act in conjunction with a waiver of inadmissibility under sections 209(c) and 237(a)(1)(H) of the Act, we nonetheless agree with the Immigration Judge's alternative determination that the respondent does not merit these forms of relief in the exercise of discretion.  Two factors guide our consideration.  First, the Attorney General has made clear that except upon a showing of "extraordinary circumstances," we may not grant adjustment of status under section 209 in the exercise of discretion to individuals who have committed "violent or dangerous" crimes, and, "depending on the gravity of the alien's underlying criminal offense, such a showing might still be insufficient." *Matter of Jean*, 23 I&N Dec. 373, 383 (A.G. 2002).  Second, "[t]he ultimate consideration when balancing factors in the exercise of discretion is to determine whether a grant of relief . . . appears to be in the best interest of the United States." *Matter of D-A-C-*, 27 I&N Dec. 575, 578 (BIA 2019).  Both factors weigh heavily against the respondent.

The evidence indicates the respondent was directly involved in killing a dozen people and was indirectly involved in the murder of scores of others based solely on their ethnicity, with the intent to destroy the ethnic group to which they belonged.  Genocide is misconduct of the most appalling and severe character, and it clearly constitutes a "violent or dangerous" crime. *See, e.g.*, *Torres-Valdivias v. Lynch*, 786 F.3d 1147, 1155 (9th Cir. 2015) (stating that this Board's "ultimate decision that a crime is in fact violent or dangerous is a discretionary decision").  Given the tremendous gravity of the respondent's misconduct, he would have to show equities of the highest order to merit adjustment of status under section 209 of the Act and a waiver of inadmissibility. *Matter of Jean*, 23 I&N Dec. at 383.

---

[13]  In light of this conclusion, we need not address whether the respondent is also barred from relief under section 212(a)(3)(E)(iii)(II) of the Act for having committed, ordered, incited, assisted, or otherwise participated in an extra-judicial killing, or whether he fails to meet the definition of a refugee under section 101(a)(42)(A) of the Act, 8 U.S.C. § 1101(a)(42)(A) (2018), because he persecuted others. *See INS v. Bagamasbad*, 429 U.S. 24, 25 (1976) (per curiam) ("As a general rule courts and agencies are not required to make findings on issues the decision of which is unnecessary to the results they reach.").

Furthermore, the prevention and punishment of the crime of genocide is a core national interest. *See, e.g.*, Elie Wiesel Genocide and Atrocities Prevention Act of 2018, Pub. L. No. 115-441, 132 Stat. 5586 (2019); Human Rights Enforcement Act of 2009, Pub. L. No. 111-122, 123 Stat. 3480; Genocide Convention Implementation Act of 1987 (the "Proxmire Act"), Pub. L. No. 100-606, 102 Stat. 3045, 3045–46 (1988) (implementing the Convention on the Prevention and Punishment of the Crime of Genocide, art. 2, Dec. 9, 1948, 78 U.N.T.S. 277, 280, by enacting 18 U.S.C. §§ 1091–93 (1988)). Only in the rarest of cases will the interests of the United States weigh in favor of conferring discretionary relief upon an individual who has committed, in the words of the Supreme Court, "acts repugnant to all civilized peoples" that "make their perpetrators 'enem[ies] of all mankind.'" *Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386, 1401–02 (2018) (alteration in original) (quoting *Sosa v. Alvarez-Machain*, 542 U.S. 692, 732 (2004)).

We acknowledge the respondent's equities, which concern the hardship his family may face as a consequence of his removal. But these factors do not relate to, recognize, or attempt to mitigate his involvement in the Rwandan genocide. They do not approach the standard necessary to overcome his past misdeeds or his attempt to conceal them in order to enter this country, and in this case a favorable exercise of discretion would not be in the interest of the United States. We therefore agree with the Immigration Judge that the respondent's application for adjustment of status in conjunction with a waiver of inadmissibility does not warrant a favorable exercise of discretion. *See Matter of C-A-S-D-*, 27 I&N Dec. 692, 699 (BIA 2019).

### 4. Deferral of Removal

We also affirm the Immigration Judge's denial of the respondent's request for deferral of removal under the Convention Against Torture. Based on the entirety of the record, we agree that the respondent has not established that it is more likely than not that he will be tortured upon return to Rwanda, nor has he established that such torture would be "inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." 8 C.F.R. § 1208.18(a)(1) (2020). "Torture is an extreme form of cruel and inhuman treatment . . . ." 8 C.F.R. § 1208.18(a)(2).

The respondent was not tortured in the past in Rwanda. 8 C.F.R. § 1208.16(c)(3)(i). The respondent testified that he would be imprisoned and tortured upon his return to Rwanda in connection with his in absentia conviction by the gacaca court. The respondent also fears that he would be

tortured in Rwanda because of his anti-government political activities in the United States and being a highly educated and outspoken Hutu.

The Immigration Judge found that the respondent failed to show that he would likely be tortured in Rwanda upon his removal. In coming to this conclusion, the Immigration Judge found that the respondent did not establish that individuals returning to Rwanda for their trials related to the 1994 genocide are generally subject to torture, and the record does not suggest that the respondent's case would likely be any different. Dr. Clark testified that defendants in gacaca trials who are convicted in absentia and later return have their verdicts annulled upon arrival and are entitled to an entirely new trial. He further testified that such individuals are detained at Mpanga in a new, purpose-built, state-of-the-art prison, which is not overcrowded and which is regularly inspected by NGOs. The Immigration Judge found Dr. Clark's testimony credible, and this finding is not clearly erroneous.

In sum, we discern no clear error in the Immigration Judge's factual findings concerning the respondent's eligibility for deferral of removal under 8 C.F.R. § 1208.17(a). *See Matter of Z-Z-O-*, 26 I&N Dec. 586, 590 (BIA 2015) (reviewing an Immigration Judge's predictive findings for clear error). The respondent has not submitted sufficient objective evidence to support his speculative fear of torture by the Rwandan Government. *See Matter of J-F-F-*, 23 I&N Dec. 912, 917–18 (A.G. 2006) (holding that a torture claim cannot be established by stringing together a series of suppositions). Additionally, although we recognize Rwanda suffers from instability and violence, this is insufficient to satisfy the standard for eligibility under the Convention Against Torture. 8 C.F.R. §§ 1208.16(c)(2), 1208.18(a)(1); *see also Matter of G-K-*, 26 I&N Dec. 88, 98 (BIA 2013) (holding that generalized evidence of government corruption or ineffectiveness is insufficient to show that a government would acquiesce in or turn a blind eye to torture). We therefore affirm the Immigration Judge's denial of deferral of removal under 8 C.F.R. § 1208.17(a). Accordingly, the respondent's appeal is dismissed.

**ORDER:** The respondent's appeal is dismissed.